******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom McDONALD, J., joins, dissenting. In the more than forty years since fifteen year old Martha Moxley (victim) was brutally murdered near her home in Greenwich, this tragic case has given rise to numerous investigations, suspects, petitions, hearings, appeals—as well as many articles, books, documentaries, and movies—and, of course, the trial that is the subject of this appeal. Unfortunately, none has brought any real closure or clarity to the case. One thing, however, is perfectly clear: the habeas court was absolutely right in concluding that the petitioner, Michael Skakel, did not receive a fair trial because, in numerous respects, the representation that he received from his chief trial counsel, Michael Sherman, fell far below the range of competence necessary to satisfy the petitioner's right to the effective assistance of counsel guaranteed by the sixth amendment to the United States constitution.[1] In fact, in its thorough and well reasoned decision, the habeas court identified *ten* separate and distinct areas in which Sherman's performance did not meet professional standards. With respect to three of them, the court found that Sherman's deficient performance was so prejudicial as to undermine confidence in the verdict and, therefore, require a new trial.[2] I agree with each and every one of those determinations, which are fully borne out by the record.

I address only two of them here, however, namely, Sherman's manifestly incompetent and prejudicial handling of the petitioner's alibi defense and the petitioner's third-party culpability defense. The former, of course, involves Sherman's failure to follow up on the grand jury testimony of Georgeann Dowdle, one of the petitioner's alibi witnesses, that her "beau," subsequently identified as Denis Ossorio, was with her and the petitioner at her home on the evening of the murder. If Sherman had taken the trouble simply to ask Dowdle about Ossorio, Sherman would have learned that Ossorio could provide critical, credible and independent testimony corroborating the petitioner's alibi, which otherwise was predicated on the testimony of only Skakel family members. The second issue involves Sherman's decision to present a third-party culpability defense centered around Kenneth Littleton, even though there was no evidence— none—linking Littleton to the murder, and even though a third-party culpability defense implicating the petitioner's brother, Thomas Skakel, in the murder, would have been truly compelling. I limit my analysis to these two areas of deficient performance because, in my view, it could hardly be more apparent that each one of them deprived the petitioner of a fair trial.

Before commencing that review, however, I wish to underscore one aspect of the majority opinion, per-

taining to the alibi issue, that is so blatantly one-sided as to call into question the basic fairness and objectivity of the majority's analysis and conclusion. As I discuss more fully hereinafter, the majority concludes that Sherman's decision to forgo any inquiry into Ossorio in furtherance of the petitioner's alibi defense was reasonable because the facts supported Sherman's belief that any further investigation probably would not be productive. See part II C of the majority opinion. Even though the case law is perfectly clear that *all* of the relevant facts and circumstances are to be considered in evaluating the objective reasonableness of such a decision; see *Strickland* v. *Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (explaining that, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness *in all the circumstances*" [emphasis added]); accord *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012); the majority's review of the alibi issue begins and ends with its conclusion that Sherman reasonably believed that it was likely that no investigation into Ossorio would be fruitful. At no time does the majority even *acknowledge*, let alone evaluate, the powerful, countervailing considerations that militate strongly *in favor* of the habeas court's determination that the sixth amendment required Sherman to conduct some additional investigation. These considerations are obvious, and include the paramount importance of the petitioner's alibi defense, the enormous significance of an unbiased and credible witness who could corroborate the alibi testimony of the Skakel family members, the ease with which such a witness promptly could have been located, and the gravity of the charge that the petitioner faced. I can conceive of only one reason why the majority refuses to take those highly relevant considerations into account: they are incompatible with the majority's conclusion that Sherman's performance was reasonable under the circumstances.[3]

I

SHERMAN'S FAILURE TO LOCATE AND INTERVIEW A CRITICAL ALIBI WITNESS CONSTITUTED DEFICIENT REPRESENTATION UNDER THE SIXTH AMENDMENT

I could not disagree more with the majority's conclusion rejecting the habeas court's decision that Sherman failed to conduct a constitutionally adequate investigation into the petitioner's alibi defense, resulting in extreme prejudice to the petitioner. In fact, I believe that the majority's analysis and conclusion represent an unprecedented and indefensible deviation from settled sixth amendment principles.

As I explain hereinafter, there are a number of serious errors in the majority's analysis that lead to its palpably wrong conclusion, but two obvious and fundamental

flaws skew its entire analysis. First, the majority employs an improper legal standard in determining that Sherman's handling of the petitioner's alibi defense comported with the petitioner's sixth amendment right to the effective assistance of counsel. More specifically, the majority concludes that Sherman's failure to interview Ossorio was not constitutionally deficient because Sherman reasonably *could have inferred* from all of the circumstances that Ossorio would not be able to provide any useful testimony. Contrary to the majority's decision, the sixth amendment does not permit defense counsel to forgo any inquiry into the testimony of a potentially critical witness like Ossorio merely because counsel *thinks* or *believes* that the witness will not be helpful; counsel has a duty to his client to take reasonable steps to find out what the witness knows, and not to rely on inference, belief or educated guess. Indeed, federal courts are unanimous on this point. Consistent with that precedent, one searches the majority opinion in vain for a case with contrary reasoning, or one that presents a fact pattern even remotely similar to this case, in which the petitioner was not awarded a new trial. I submit that none exists.

Second, as I mentioned previously, the majority considers only those factors that support its conclusion justifying Sherman's failure to follow up on Dowdle's testimony, and chooses to ignore *all* of the compelling considerations that militate in favor of the habeas court's determination that Sherman had a clear duty to undertake a further inquiry into Dowdle's "beau." By any fair measure, Sherman's decision to simply disregard Dowdle's grand jury testimony and to make no effort to find Ossorio was particularly unreasonable and professionally irresponsible under the facts and circumstances that the majority simply ignores. The charge that the petitioner faced—murder, which carried a maximum sentence of life imprisonment—could not be more serious, and the importance of corroborative alibi testimony—from an independent, nonfamily member witness like Ossorio—cannot be overstated. Sherman reasonably could not have ruled out the possibility that Ossorio would be able to provide such testimony, and he would have confirmed that Ossorio could, in fact, do so merely by asking Dowdle to identify her "beau," who, at that time, lived within miles of Sherman's law office, and then by contacting Ossorio, who was ready, willing and able to testify—credibly, as the habeas court found—on the petitioner's behalf. As the United States Supreme Court has observed in a case involving this very issue, "[w]hen viewed in this light, the '[reasonable] decision' the [majority and the state both] invoke to justify counsel's [failure to pursue] mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to [trial]." *Wiggins* v. *Smith*, 539 U.S. 510, 526–27, 123 S. Ct. 2527, 156 L. Ed. 2d

471 (2003).

Not surprisingly, both Sherman and his associate, Jason Throne, testified without contradiction that an objective and unbiased witness would have been critical to the petitioner's alibi defense, and that they were very eager to locate a witness who met that profile. And yet, when Sherman and Throne learned by reading the grand jury testimony of *their own witness*, Dowdle, that just such an independent and unbiased witness—her former "beau"—was at the home of James Terrien, with Dowdle, on the evening of October 30, 1975, they did *nothing* in response to that testimony. Nevertheless, the majority concludes that Sherman and Throne reasonably decided that it just was not worth the effort to follow up on Dowdle's testimony, even though it would have entailed nothing more than a couple of telephone calls.

It is perplexing, to say the least, that the majority endorses an investigative approach that reflects such a gross lack of attention and effort, one that created such a serious and needless risk that the petitioner's case would be severely prejudiced because of counsel's cavalier refusal to pursue a potentially critical lead. In fact, I cannot fathom why the majority sets the bar so low, or why it employs such a skewed and one-sided analysis in doing so.

A

The Facts

The relevant facts and procedural history pertaining to this issue are largely undisputed. Within hours of the discovery of the victim's body around 12:30 p.m. on October 31, 1975, the police began interviewing those persons who might be able to provide useful information about the events surrounding the victim's murder. In one of those interviews, Thomas Skakel informed the police that he had been with the victim until approximately 9:30 p.m. on October 30, at which time both of them departed for their respective homes. Thomas Skakel also told the police that, at about that same time, the petitioner left for the Terrien home, which is about a twenty minute car ride from the Skakel home, in Thomas Skakel's father's Lincoln Continental, accompanied by his brothers John Skakel and Rushton Skakel, Jr., and their cousin, Terrien.[4] In his interview with the police, the petitioner also stated that he had gone to the Terrien home around 9:30 p.m., watched television there, and did not return home until approximately 11 p.m. Interview reports of others who were questioned by the police soon after the discovery of the victim's body do not indicate whether those persons were questioned about the activities and whereabouts of Thomas Skakel and the petitioner in the general time frame of the murder. In the weeks following the murder, however, everyone who expressed any knowledge about the comings and goings of the petitioner and

Thomas Skakel corroborated the statements that they had given to the police. Among those who did so in their police interviews were John Skakel, Rushton Skakel, Jr., and Terrien. In addition, Terrien's sister, Dowdle, told the police that the petitioner was at the Terrien home (where she resided) on the evening of October 30, 1975, along with her brother and her cousins, John Skakel and Rushton Skakel, Jr.

Shortly after the murder, the prime suspect in the victim's death was Thomas Skakel, for whom the Greenwich police sought permission from the Office of the State's Attorney to apply for an arrest warrant. Permission was denied because the state's attorney did not believe that the evidence set forth in the warrant application and affidavit constituted probable cause to believe that Thomas Skakel had committed the murder. Although the investigation into the victim's death continued for some time,[5] the petitioner did not become a suspect until sometime in the mid-1990s. As a consequence, for at least twenty years following the victim's death, investigators had no reason to focus their attention on the petitioner or his activities, and did not do so.

Apparently prompted by information gleaned from a report prepared by Sutton Associates, a private security firm, sometime in the mid-1990s,[6] those investigators undertook to develop a case against the petitioner. Because of this investigation, in July, 1998, the petitioner retained Sherman to represent him.

In connection with that renewed investigation, a grand jury was empaneled at the state's request for the purpose of acquiring additional evidence about the murder and, in particular, evidence linking the petitioner thereto. Numerous people were called to appear before the grand jury, one of whom was Dowdle. On September 22, 1998, she testified before the grand jury under oath that she was home on the evening of October 30, 1975, when her brother, Terrien, and cousins, the Skakels, arrived around 9:30 p.m. to watch television. Because she was in her mother's library putting her daughter to bed, and Terrien and the Skakels were in a room located off the library, she could say only that she heard the Skakels' voices but could not recall, given the passage of time, whether she actually saw the petitioner. Dowdle also testified, however, that, when interviewed by the police shortly after the murder, she told them that the petitioner had been at her home that evening. She further testified that her "beau" was with her that evening at her home. Sherman, however, never followed up on Dowdle's testimony that she had a companion, her "beau," that evening.

Following completion of the grand jury investigation, in January, 2000, the petitioner was charged with the victim's murder, and the petitioner's criminal trial commenced in early May, 2002. In their trial testimony in support of the petitioner's alibi defense, Rushton Ska-

kel, Jr., and Terrien explained, consistent with their grand jury testimony and the statements that they had given to the police some twenty-seven years earlier, that they and the petitioner, along with John Skakel, had driven to the Terrien residence at around 9:30 p.m. on October 30, 1975, remained there until about 11 p.m., and then returned home. John Skakel also testified at trial but stated that he could not recall whether the petitioner had gone to the Terrien home that evening. When asked, however, whether the statement he had given to the police soon after the murder accurately reflected what he knew at the time—that is, that the petitioner was at the Terrien home with other family members that evening—John Skakel responded in the affirmative. Finally, Dowdle's trial testimony mirrored her grand jury testimony. In fact, during questioning of Dowdle by State's Attorney Jonathan Benedict about her grand jury testimony, Dowdle expressly reiterated that a "friend" was with her at the Terrien home on the evening of October 30, and, in addition, while she was still on the stand, a portion of her grand jury testimony containing the reference to her "beau" was read and published to the jury. Again, Sherman took no action with respect to the identity, availability or potential testimony of Dowdle's "beau."

Benedict sought to rebut the petitioner's alibi defense with the testimony of three witnesses, Helen Ix, Andrea Shakespeare, and Julie Skakel, all of whom were present at the Skakel residence from approximately 9 to 9:30 p.m. on October 30, 1975. Ix and the victim, Ix' close friend, had gone to the Skakel home together, arriving shortly after 9 p.m. Ix remained there until approximately 9:30 p.m., when she left and went home. On direct examination, Ix testified that she was uncertain whether the petitioner was in the car when it headed for the Terrien residence; on cross-examination, however, she indicated that she thought that he was in the car, but she was not sure in light of the passage of time.

Shakespeare, a good friend of Julie Skakel's, had been with the Skakel family at dinner that evening and returned with the family members to the Skakel residence at about 9 p.m. Initially, on direct examination by the state, Shakespeare asserted that the petitioner had remained at home when the Skakel brothers left for the Terrien residence. Thereafter, however, upon being recalled to testify by Sherman, she acknowledged that she had given a tape-recorded statement to the police in 1991, the relevant portion of which was played for the jury, in which she stated that she did not see the car when it left for the Terrien residence and that she therefore did not see whether the petitioner was in the car. She further told the police that, although she believed that the petitioner had gone to the Terrien residence, she had no independent recollection of the events in question and that her belief was based on

what others had told her had occurred on the evening of October 30, 1975.

Finally, Julie Skakel, the petitioner's sister, testified that she was uncertain about the events of that evening. In light of that testimony, the state was permitted to introduce a statement that she had made in a prior proceeding in which she stated that, at around 9:20 p.m. on October 30, 1975, she saw an unidentified person run by, just outside a window in the Skakel residence, and that she called out, "Michael, come back here." The significance of this testimony was to demonstrate that, at least at that moment in time, Julie Skakel believed that the figure she observed through the window was the petitioner.

At the conclusion of the evidence, Benedict, in his closing argument to the jury, acknowledged that the petitioner's proffered alibi was the "cornerstone of the defense . . . ." In fact, according to Benedict, the alibi was the key component of a scheme, hatched by the petitioner's father, Rushton Skakel, Sr., and furthered by the entire Skakel family, all of whom, Benedict alleged, siblings and cousins alike, knew that the petitioner had murdered the victim, to shield the petitioner from the consequences of his heinous crime. Benedict argued that the family plot to protect the petitioner commenced "on October 30, 1975, with the disappearance . . . [and] disposal" of incriminating evidence, including "the golf club, the shaft and any other evidence of the crime" within "thirty-six hours" of its commission. The cover-up continued the day after the murder, when Littleton was "ordered" to take the petitioner, Thomas Skakel, John Skakel, and Terrien for an overnight visit to the Skakel family home in Windham, New York, the place where the conspiracy allegedly "took shape." In the state's view, the family's effort to "advance" this "produced" and "concocted" alibi continued during the grand jury proceedings and at the petitioner's criminal trial, at which the petitioner's witnesses all gave intentionally false testimony in asserting that the petitioner was at the Terrien residence when, according to the great weight of the evidence, the victim was being murdered. Finally, Benedict repeatedly and forcefully reminded the jurors that the petitioner's alibi witnesses were all family members, emphasizing that "[n]o independent witness [could] say what happened once [the] Lincoln [Continental] backed out of the driveway" of the Skakel home at about 9:15 p.m. on October 30, 1975. Benedict's argument evidently was convincing, because the jury, after expressly requesting that the testimony of Ix, Shakespeare and Julie Skakel be read back—the only testimony offered by the state that even arguably tended to refute the petitioner's alibi—found the petitioner guilty.[7]

Thereafter, following an unsuccessful appeal from the judgment of conviction; see *State* v. *Skakel*, 276

Conn. 633, 770, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); and from the denial of his petition for a new trial; see *Skakel* v. *State*, 295 Conn. 447, 452, 991 A.2d 414 (2010); the petitioner commenced the present habeas action. I now briefly summarize testimony from the habeas trial that is pertinent to the petitioner's contention that Sherman failed to conduct a constitutionally adequate investigation of his alibi defense.

The petitioner elicited testimony from Ossorio, a psychologist who was seventy-two years old at the time of the habeas trial, that he was visiting Dowdle at the Terrien residence during the evening of October 30, 1975, and until around midnight on October 31, and that the petitioner and several others also were there that evening, watching television in the library. Ossorio testified that, although he was visiting Dowdle, who was caring for her child, he "was in and out" of the room in which the petitioner and the others who were there that evening were watching television. Ossorio, who further testified that he resided in Greenwich at the time of the petitioner's criminal trial, stated that neither the police nor the defense had ever sought to interview him regarding his presence at the Terrien residence on that date, and that he had never come forward because he did not pay close enough attention to the trial to appreciate that his presence at the Terrien residence, and his recollection of the evening's events, would have been important to the case. The habeas court expressly credited Ossorio, who it characterized as a "disinterested," "powerful," and "credible" witness.

The petitioner also presented the testimony of Michael Fitzpatrick, a prominent Connecticut attorney and past president of the Connecticut Criminal Defense Lawyers Association who specializes in criminal defense and civil litigation. Fitzpatrick testified that he had spent more than 200 hours reviewing all of the transcripts and other materials relevant to the petitioner's habeas claims, and, on the basis of his expertise and experience in the field of criminal law, it was his opinion that a reasonably competent criminal defense attorney, after receiving and reviewing Dowdle's grand jury testimony, "absolutely" would have ascertained Ossorio's identity and then made reasonable efforts to locate and interview him. That investigation was required, according to Fitzpatrick, because it was incumbent on Sherman to confirm that Ossorio was present at the Terrien residence on October 30, 1975, and, if so, whether his recollection of the events would strengthen the petitioner's alibi defense. In particular, Fitzpatrick explained that, if Ossorio recalled that the petitioner was present at the Terrien home that evening, that testimony would have "[made] it impossible for the state to argue in summation that there [was] not a single independent [alibi] witness in the case, which was one of the chief grounds the state asserted for

rejecting the alibi." Fitzpatrick further testified that Sherman's failure to identify and interview Ossorio "absolutely prejudiced" the petitioner because "it deprived [him] . . . of the opportunity to present an independent alibi witness, and we know by way of fact . . . that he was convicted, [and] that the jury unanimously rejected the alibi."

Throne, an associate in Sherman's office who served as cocounsel for the petitioner along with Sherman, also was a witness at the habeas trial. Among other subjects, Throne testified about the petitioner's alibi, explaining that it was "extremely important" to the petitioner's overall defense of the charge against him. When asked if the petitioner's trial counsel were "eager to find anyone who could corroborate [the alibi]," Throne responded, "[a]bsolutely, without question." Throne further stated that, "even more importantly," the petitioner's counsel were "especially eager to find a nonfamily member who could corroborate [the petitioner's alibi]." He elaborated on that testimony by noting the "obvious concern" that the petitioner's counsel had because all of the alibi witnesses were family members, and because of the likelihood that "the jury would perceive all of those witnesses as having bias and a motivation to lie or distort facts or truth, which wasn't the case. . . . I wish that we had even a single witness that wasn't blood related to include in that group that could have testified to the same facts that everyone else testified to, to establish that [the petitioner] was not there the night of the murder." According to Throne, the testimony of an independent, nonfamily alibi witness would have been "critical" to the petitioner's alibi defense.

Finally, Sherman testified at the habeas trial. When asked whether the alibi was the petitioner's "principal defense" at his criminal trial, Sherman responded, "[a]bsolutely," and, thereafter, characterized the alibi defense as "our mainframe." He also stated that it would have been "very important" to have an alibi witness who was not related to the petitioner and that, if he had located one, he would have had him testify in support of the petitioner's alibi, "[w]ithout a doubt." In response to questioning from the state, and with reference to Dowdle's grand jury testimony, Sherman indicated that, because Dowdle had testified that she "really didn't venture out" of the library on the evening of October 30, 1975, Ossorio, her guest, might well have stayed in the library, as well. Sherman further agreed that, because Dowdle recalled hearing but not seeing the Skakel relatives in a nearby room, Ossorio also may not have seen the Skakels. Sherman also acknowledged that he had read Dowdle's grand jury testimony prior to trial, testimony that included her statement that her "beau" was with her that evening at the Terrien home. When Sherman was asked why he had never inquired into the identity of Dowdle's "beau," Sherman explained

simply that, "I had no reason to suspect that he, in fact, would be helpful in that he saw [the petitioner] and the rest of the boys."

## B

### The Applicable Law

As the majority notes, the sixth amendment guarantees criminal defendants the effective assistance of counsel; *Strickland* v. *Washington*, supra, 466 U.S. 687; and that guarantee "is beyond question a fundamental right." *Kimmelman* v. *Morrison*, 477 U.S. 365, 377, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). "The [s]ixth [a]mendment recognizes [this right] because it envisions [that counsel will play] a role that is critical to the ability of the adversarial system to produce just results." (Internal quotation marks omitted.) Id., 394. "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." (Internal quotation marks omitted.) Id., 384. Consequently, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." (Internal quotation marks omitted.) Id., 377.

These general principles are no less applicable to the investigative stage of a criminal case than they are to the trial phase. Indeed, the United States Supreme Court has explained that the foregoing "standards require no special amplification in order to define counsel's duty to investigate . . . . [Simply stated], strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* v. *Washington*, supra, 466 U.S. 690–91. That is, counsel's decision to forgo or truncate an investigation "must be directly assessed for reasonableness in all the circumstances . . . ." Id., 691. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins* v. *Smith*, supra, 539 U.S. 527. In addition, in contrast to our evaluation of the constitutional adequacy of counsel's strategic decisions, which are entitled to deference, when the issue is whether "the investigation *supporting* counsel's [strategic] decision" to proceed in a certain manner "was itself reasonable"; (emphasis altered) id., 523; "we must conduct an *objective review* of [the reasonableness of counsel's] performance . . . ." (Emphasis added.) Id. Thus, "deference to counsel's strategic decisions does not excuse an inadequate investigation . . . ." *Williams* v. *Stephens*, 575 Fed. Appx. 380, 386 (5th Cir.), cert. denied,        U.S.

, 135 S. Ct. 875, 190 L. Ed. 2d 709 (2014). Finally, because a thorough pretrial investigation is so often an essential component of the defense of a criminal case—especially if the case is complex or involves particularly serious charges—"[c]ourts have not hesitated to find ineffective assistance in violation of the [s]ixth [a]mendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client." *Towns* v. *Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

Although the reasonableness of any particular investigation necessarily depends on the unique facts of any given case; see, e.g., *Strickland* v. *Washington*, supra, 466 U.S. 688–89; counsel has certain baseline responsibilities that must be discharged in every criminal matter. "It is the duty of the [defense] lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case . . . ." (Internal quotation marks omitted.) *Rompilla* v. *Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); see also, e.g., *McCoy* v. *Newsome*, 953 F.2d 1252, 1262–63 (11th Cir.) ("[w]hen a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the lawyer has failed to render effective assistance of counsel" [internal quotation marks omitted]), cert. denied, 504 U.S. 944, 112 S. Ct. 2283, 119 L. Ed. 2d 208 (1992). This duty exists irrespective of whether the defendant is helpful to counsel by providing information pertinent to his defense or whether he provides no such assistance. See *Rompilla* v. *Beard*, supra, 381 (although petitioner was unwilling to assist counsel in pretrial preparation and "was even actively obstructive by sending counsel off on false leads," counsel nevertheless had independent obligation to conduct thorough investigation); *Daniels* v. *Woodford*, 428 F.3d 1181, 1202–1203 (9th Cir. 2005) ("[e]ven though [the petitioner] refused to speak to his counsel, [counsel] still had an independent duty to investigate [and prepare]" because "[p]retrial investigation and preparation are the keys to effective representation of counsel" [internal quotation marks omitted]), cert. denied sub nom. *Ayers* v. *Daniels*, 550 U.S. 968, 127 S. Ct. 2876, 167 L. Ed. 2d 1152 (2007). Thus, "[a]n attorney's duty of investigation requires more than simply checking out the witnesses that the client himself identifies." *Bigelow* v. *Haviland*, 576 F.3d 284, 288 (6th Cir. 2009); see also id., 288–89 ("[Defense counsel] had no reasonable basis for assuming that [the petitioner's] lack of information about still more witnesses meant that there were none to be found. . . . With every effort to view the facts as a defense lawyer would have [viewed them] at the time, it is difficult to see how [defense counsel] could have failed to realize that without seeking information that could either corroborate the alibi or contextualize it for the jury, he was seriously compromis[ing] [his] opportunity

to present an alibi defense." [Citations omitted; internal quotation marks omitted.]).

Of course, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla* v. *Beard*, supra, 545 U.S. 383. In other words, counsel is not required to conduct an investigation that "promise[s] less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." Id., 389. But "[p]retrial investigation and preparation are the keys to effective representation of counsel"; (internal quotation marks omitted) *Daniels* v. *Woodford*, supra, 428 F.3d 1203; see also *House* v. *Balkcom*, 725 F.2d 608, 618 (11th Cir.) ("[p]retrial investigation, principally because it provides a basis [on] which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation"), cert. denied, 469 U.S. 870, 105 S. Ct. 218, 83 L. Ed. 2d 148 (1984); and counsel is therefore not free to simply ignore or disregard potential witnesses who might be able to provide exculpatory testimony. See, e.g., *Blackmon* v. *Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016) ("Just one [potential] witness might have been able to give [the petitioner] a true alibi. At a minimum, all of [the potential witnesses] could have bolstered his [alibi] claim. . . . It is not reasonable strategy to leave such possible testimony unexplored under these circumstances."); *Ramonez* v. *Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) ("[h]aving . . . recognized the possibility that the three witnesses could provide testimony beneficial to [the petitioner], it was objectively unreasonable" for counsel to terminate his pretrial investigation before learning what those witnesses had to say); *Gersten* v. *Senkowski*, 426 F.3d 588, 610 (2d Cir. 2005) (defense counsel rendered ineffective assistance in concluding investigation prematurely because he "never discovered any evidence to suggest one way or another whether [further investigation] would be counterproductive or such investigation fruitless, nor did counsel have any reasonable basis to conclude that such investigation would be wasteful"), cert. denied sub nom. *Artus* v. *Gersten*, 547 U.S. 1191, 126 S. Ct. 2882, 165 L. Ed. 2d 894 (2006); *Pavel* v. *Hollins*, 261 F.3d 210, 220–21 (2d Cir. 2001) ("First, there is simply no suggestion in the record that there was any reason not to put [the witness] on the stand, and an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it. . . . And, second, [defense counsel's failure to put her] on the stand was based on an inadequate investigation. . . . [Defense counsel] never contacted [the witness] with regard to her putative testimony, and never inquired into whether she might be willing to testify on [the petitioner's] behalf. . . . [In cases in which a criti-

cal issue is the relative credibility of the party's witnesses], it should be perfectly obvious that it will almost always be useful for defense counsel to speak before trial with [readily available] fact witnesses whose noncumulative testimony would directly corroborate the defense's theory of important disputes. Accordingly, when [defense counsel] learned before trial that [she] might well be such a witness, he should have taken affirmative steps to discuss the case with her. . . . But [defense counsel] . . . did not contact [the witness]. Indeed, there is no indication in the record that [counsel] conducted *any* substantial, affirmative investigation into [the witness'] potential testimony." [Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.]).

Similarly, a decision by counsel to forgo an investigation into the possible testimony of a potentially significant witness is constitutionally unacceptable unless counsel has a sound justification for doing so; speculation, guesswork or uninformed assumptions about the availability or import of that testimony will not suffice. Instead, counsel must seek to interview the witness— or have the witness interviewed—to determine the value of any testimony that he may be able to provide. See, e.g., *Ramonez* v. *Berghuis*, supra, 490 F.3d 489 ("[c]onstitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation"); *Pavel* v. *Hollins*, supra, 261 F.3d 221 (defense counsel never contacted potentially favorable witness because counsel was "confident as to what [that] witness would say," but "counsel's anticipation [of that testimony] does not excuse the failure to find out" [internal quotation marks omitted]); *United States* v. *Moore*, 554 F.2d 1086, 1093 (D.C. Cir. 1976) ("counsel's anticipation of what a potential witness would say does not excuse the failure to find out; speculation cannot substitute for certainty").[8] In the same vein, when counsel's failure to proceed with an investigation is due not to professional or strategic judgment but, instead, results from oversight, inattention or lack of thoroughness and preparation, no deference or presumption of reasonableness is warranted. See, e.g., *Carter* v. *Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) ("[t]he consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness" [internal quotation marks omitted]); *Wilson* v. *Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (errors warranting determination of sixth amendment violation include "omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but [rather, that] arose from oversight, carelessness, ineptitude, or laziness" [internal quotation marks omitted]).

As I previously indicated, in determining whether

counsel's pretrial investigation satisfied existing professional norms, we consider the nature and extent of the investigation in light of all relevant circumstances. *Strickland* v. *Washington*, supra, 466 U.S. 691. One such consideration is whether defense counsel undertook any investigation with respect to the particular witness involved, and, if so, at what point and for what reason did counsel decide to forgo any further investigation. A complete failure to take even the most elementary investigative steps with respect to a potential defense or witness is frequently deemed to be constitutionally inadequate. See, e.g., *Bond* v. *Beard*, 539 F.3d 256, 289 (3d Cir. 2008), cert. denied, 558 U.S. 835, 130 S. Ct. 81, 175 L. Ed. 2d 56 (2009), and cert. denied, 558 U.S. 932, 130 S. Ct. 58, 175 L. Ed. 2d 232 (2009); *Ramonez* v. *Berghuis*, supra, 490 F.3d 489; *Towns* v. *Smith*, supra, 395 F.3d 259; *Soffar* v. *Dretke*, 368 F.3d 441, 473–74 (5th Cir.), amended in part on other grounds, 391 F.3d 703 (5th Cir. 2004).

Finally, with specific regard to the duty to investigate a defendant's alibi defense, counsel is obligated to make all reasonable efforts to identify and interview potential alibi witnesses. See, e.g., *Towns* v. *Smith*, supra, 395 F.3d 259 ("Without even attempting to interview [the witness], counsel simply decided not to call him as a witness. That decision was objectively unreasonable because it was a decision made without undertaking a full investigation into whether [the witness] could assist in [the petitioner's] defense. . . . By failing even to contact [the witness] . . . counsel abandoned his investigation at an unreasonable juncture, making a fully informed decision with respect to [whether to have the witness testify] impossible." [Citation omitted; internal quotation marks omitted.]); *Bryant* v. *Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) ("[A]n attorney must engage in a reasonable amount of pretrial investigation and at a minimum . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case. . . . [W]hen alibi witnesses are involved, it is unreasonable for counsel not to try to contact the witnesses and ascertain whether their testimony would aid the defense." [Citations omitted; internal quotation marks omitted.]).

Furthermore, the failure to conduct a thorough investigation of an alibi defense is perhaps most damaging when "the missing witness is disinterested in a case in which the other witnesses have a relationship to the defendant." *Carter* v. *Duncan*, supra, 819 F.3d 943; see also *Blackmon* v. *Williams*, supra, 823 F.3d 1104–1105 (explaining that unreasonableness of counsel's failure to investigate was compounded by "significant potential benefits of obtaining alibi testimony from witnesses unimpaired by family ties to [the petitioner]"); *Montgomery* v. *Petersen*, 846 F.2d 407, 413 (7th Cir. 1988) (characterizing disinterested alibi witness who defense counsel unreasonably failed to identify and locate as

"extraordinarily significant" when all twelve alibi witnesses were either relatives or close friends of petitioner).

In light of these general principles, it is readily apparent that Sherman's decision to disregard Dowdle's grand jury testimony about her "beau"—a decision based solely on Sherman's belief that any inquiry into that subject matter would not have been fruitful—was profoundly unreasonable under the circumstances. As a result, Sherman failed by a wide margin to satisfy *Strickland*'s requirement that a decision to forgo or truncate a particular pretrial investigation must flow from an informed professional judgment.

Accordingly, the habeas court properly reached the only conclusion that the facts and law support: Sherman could not reasonably have elected simply to ignore Dowdle's grand jury testimony and do nothing to contact her former "beau," because all of the other alibi witnesses were close relatives of the petitioner, and Sherman knew both that the state would argue that those witnesses were all lying to protect the petitioner and that an independent alibi witness, with no ties to the petitioner or his family, would have enhanced the credibility of the petitioner's alibi immeasurably.

C

The Flaws in the Majority's Conclusion That the Habeas Court Incorrectly Concluded That Sherman Rendered Ineffective Assistance in His Handling of the Petitioner's Alibi Defense

The habeas court's memorandum of decision is meticulous and thoughtful, and that court's conclusion is fully supported by the facts and the law governing claims alleging ineffective assistance of counsel. Unfortunately for the petitioner—and, more generally, for the interests of justice—the same cannot be said of the majority opinion.

The majority identifies four reasons for rejecting the habeas court's conclusion that Sherman's handling of the petitioner's alibi defense did not satisfy constitutional standards. First, the majority asserts that Sherman reasonably could have believed that, despite Dowdle's testimony to the contrary, her unnamed "beau" was not, in fact, at the Terrien home on the evening of October 30, 1975, because neither the petitioner nor any of his alibi witnesses had told Sherman about the presence of Dowdle's "beau" at the Terrien home that evening. The majority next claims that it was not unreasonable for Sherman either to have "overlook[ed] or disregard[ed]" Dowdle's testimony about her "beau" because there was no reference to any such person in any of the interview reports and other materials that had been turned over to Sherman in discovery, and Dowdle's reference to her "beau" was therefore

aberrational. Third, even if Dowdle's "beau" was at the Terrien home that evening, it was reasonable for Sherman to infer that, like Dowdle herself, he more or less stayed in the library, where he, Dowdle and her child were located, and, consequently, it also was reasonable for Sherman to assume that the "beau" did not go into the nearby room where the Skakel brothers and Terrien were watching television. Finally, the majority contends that, more than twenty years later, it was not unreasonable for Sherman to think that Dowdle's "beau," having never been interviewed or otherwise having come forward, likely would not have a reliable memory of the events of the evening of October 30, 1975. The majority asserts that, because these considerations provided Sherman with legitimate reasons to think that Dowdle's "beau" would not be able to provide helpful alibi testimony, Sherman's decision to take no action of any kind to identify the "beau" also was reasonable.

As I explain hereinafter, these considerations fall far short of justifying Sherman's failure to take even the most preliminary investigative steps to ascertain whether Dowdle's "beau" could offer valuable alibi evidence. But, before doing do, I first explain the majority's use of an improper standard to determine whether Sherman was constitutionally required to make a reasonable inquiry into what, if anything, Dowdle's "beau" knew about the petitioner's whereabouts on the evening of October 30, 1975. I then discuss the multiple, compelling reasons why no competent attorney would have failed to conduct such an obvious and simple investigation in the present case. Thereafter, I return to the four reasons on which the majority relies to support its conclusion that Sherman acted reasonably in doing nothing to follow up on Dowdle's testimony about her "beau."

1

The Majority Employs the Wrong Legal Standard

The standard that the majority uses for determining whether Sherman performed competently in declining to act on Dowdle's grand jury testimony concerning her "beau" is whether Sherman reasonably could have concluded that such an investigation more than likely would not result in the discovery of any favorable testimony. According to the majority, under *Strickland*, Sherman had no constitutional duty to try to learn anything at all about Dowdle's "beau" because Sherman reasonably believed, in light of all the relevant circumstances, that her "beau" probably would not be able to provide any useful alibi testimony. On first reading, this reasoning might seem persuasive because it arguably was reasonable for Sherman to think that there was a better than even chance that Dowdle's "beau" either would not be available to testify, or that he did not see the petitioner at the Terrien home on the evening of October 30, 1975, or that he could not recall the relevant events of that evening. The majority's test, however, is

patently unsupportable because whether Sherman had a duty to investigate Ossorio's potential value as an alibi witness does not depend on whether Sherman reasonably may have believed or inferred that Ossorio more likely than not had no useful information. The proper standard, rather, is whether, under all the circumstances, a competent attorney would have undertaken reasonable efforts *to determine* whether Ossorio had any such information. It is perfectly clear that, by doing absolutely nothing to ascertain Ossorio's potential value as an alibi witness, Sherman failed woefully to meet that standard.

Accordingly, even if the reasons proffered by the majority support a reasonable inference that Ossorio might well not have been able to assist the petitioner's defense, that inference would not remotely justify Sherman's failure to ascertain Ossorio's identity from Dowdle and to learn, from Ossorio himself, whether he saw the petitioner at the Terrien residence on the evening of October 30, 1975. As long as the facts and circumstances known to Sherman gave rise to a *reasonable possibility* that Ossorio might be able to provide valuable testimony, Sherman inarguably had an obligation to make a reasonable effort to find Ossorio and to ask him. As I explain hereinafter, those facts and circumstances leave no doubt that Sherman violated the petitioner's constitutionally protected right to counsel by not making such an effort.

The reasonable inference or belief standard that the majority adopts has no legal precedent and is entirely inadequate to protect the sixth amendment rights of an accused. Under that standard, a defense attorney would be free to refuse to initiate a reasonable investigation into the possible testimony of a potentially important witness, even in cases in which there remains a reasonable prospect that the witness will be able to provide vital defense evidence. Indeed, under the majority's standard, defense counsel could abdicate any duty to investigate eyewitness testimony whenever conditions render it reasonably likely that the witness' ability to observe or recall could have been impaired—for example, due to darkness, the consumption of alcohol, or the like. That simply cannot be the standard contemplated by the sixth amendment, as it would give defense attorneys far too much leeway to decline to investigate potential witnesses when there is still a reasonable chance that the witness will be able to provide valuable testimony. Due to the significance of the pretrial investigation stage of a criminal case, the right to the effective assistance of counsel must include the right to have counsel conduct a reasonable investigation into any potentially important witness unless defense counsel can rule out any reasonable likelihood that the witness may be able to provide favorable testimony. That standard, in stark contrast to the majority's approach, affords criminal defendants an appropriate level of pro-

tection because, under that test, defense counsel must take reasonable steps to follow leads for which there is a real and legitimate possibility that the investigation will yield favorable results, yet, at the same time, counsel permissibly may decide against initiating or continuing an investigation when doing so would simply be a waste of time; see *Rompilla* v. *Beard,* supra, 545 U.S. 383; tantamount to a "scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found"; *United States* v. *Farr,* 297 F.3d 651, 658 (7th Cir. 2002); or otherwise "pointless"; *United States* v. *Weaver,* 882 F.2d 1128, 1138 (7th Cir.), cert. denied sub nom. *Schmanke* v. *United States,* 493 U.S. 968, 110 S. Ct. 415, 107 L. Ed. 2d 380 (1989); "futile"; *United States* v. *Six,* 600 Fed. Appx. 346, 350 (6th Cir. 2015); or "harmful to the defense." *Harrington* v. *Richter,* 562 U.S. 86, 108, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

The sixth amendment does not mandate perfect counsel, of course, but it does require more of counsel during the pretrial investigation stage of the case than merely picking the lowest hanging fruit. Consequently, even if the reasons proffered by the majority justified the belief that Ossorio more than likely would not have been able to provide evidence favorable to the petitioner, that inference does not justify Sherman's failure to make reasonable efforts to find out whether Ossorio was in a position to do so. This is hardly a case in which additional investigation would have been an exercise in futility or a waste of time. On the contrary, this is a case "in which the [petitioner's] attorneys failed to act while potentially powerful mitigating evidence was staring them in the face  . . . ." (Citations omitted.) *Bobby* v. *Van Hook,* 558 U.S. 4, 11, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009). When, as in the present case, a defendant is being tried for murder and defense counsel knows of a potential witness who may be able to provide testimony critical to the defendant's primary defense, counsel may not rely on inferences, beliefs or deductions in deciding to forgo even the most rudimentary investigation into whether that witness can corroborate that defense.

2

Under the Proper Standard, Why There Are Compelling
Reasons Why Sherman Was Required To Make
Reasonable Efforts To Locate Ossorio

The reasonableness of Sherman's decision not to investigate whether Dowdle's "beau" could provide testimony favorable to the petitioner turns on the facts of the case and the circumstances pertaining to the witness. As I previously indicated, there are several compelling reasons why it was absolutely necessary for Sherman to have made reasonable efforts to find out whether Ossorio could corroborate the petitioner's alibi, all of which the majority ignores. These reasons

include (1) the firsthand nature of the source of the information to be investigated, (2) the importance of the petitioner's alibi defense, (3) the significance of Ossorio's testimony to that defense, (4) the import of Ossorio's testimony to rebut the state's claim of a long-standing family cover-up, (5) the ease with which Sherman could have discovered that Ossorio clearly remembered that the petitioner was at the Terrien home on the evening at issue, and (6) the gravity of the criminal charges and the magnitude of the sentence that the petitioner faced. In light of these considerations, it was inexcusable for Sherman to do nothing to ascertain Ossorio's identity, locate him, and then, upon doing so, either rule him out as an alibi witness or secure his testimony for trial if, as it has now been established, he could credibly corroborate that alibi.

Before I address these considerations, it bears emphasis that the habeas court reviewed them, along with the reasons proffered by the respondent, the Commissioner of Correction, for concluding that Sherman was not unreasonable in failing to follow up on Dowdle's grand jury testimony, and found, quite properly, that they outweigh the countervailing factors advanced by the respondent. Inexplicably, however, the majority *does not even mention* the considerations on which the habeas court and the petitioner relied; nor does the majority explain why they are not substantially more weighty and consequential than Sherman's belief that there probably was no point in even trying to determine whether Dowdle's "beau" would be able to corroborate the petitioner's alibi defense. The court in *Strickland* made clear that, if counsel elects not to undertake a particular investigation, that decision itself must be reasonable under all of the circumstances. *Strickland* v. *Washington*, supra, 466 U.S. 691. As I discuss hereinafter, the reasons that the majority proffers to justify Sherman's decision not to follow up on Dowdle's testimony are mere makeweights—indeed, they smack of the same kind of after the fact rationalization of counsel's conduct that the United States Supreme Court rejected in *Wiggins* v. *Smith*, supra, 539 U.S. 526–27—and pale by comparison to the following, truly compelling considerations that support the petitioner's contention that Sherman's failure to take any action in regard to Ossorio violated the petitioner's sixth amendment right to counsel.

The first such consideration is the firsthand nature of the information provided by Dowdle in her grand jury testimony. Although Dowdle gave no indication one way or the other in that testimony whether Ossorio knew of the petitioner's presence at the Terrien home on the evening of October 30, 1975, Dowdle did have direct knowledge that another identifiable and presumably independent person, Ossorio, was there that evening. Thus, Dowdle's information about Ossorio's presence was not based on hearsay or speculation; she had

personal knowledge that Ossorio was at the Terrien home that evening.

Second, the petitioner's alibi was his primary defense to the state's case against him. Although the state contended that it was possible that the victim was murdered as late as 1 a.m. on October 31, 1975, the substantial weight of the evidence indicated that the murder most likely was committed between 9:30 and 10 p.m. on October 30. Consequently, because the state was required to disprove the petitioner's alibi beyond a reasonable doubt; see, e.g., *State* v. *Butler*, 207 Conn. 619, 631, 543 A.2d 270 (1988) (defendant in criminal case is entitled to instruction that state must rebut alibi defense beyond reasonable doubt); if the jury believed the petitioner's alibi witnesses—indeed, even if the petitioner's witnesses merely raised a reasonable doubt in the jurors' minds as to the petitioner's whereabouts between 9:30 and 10 p.m.—there is a very good likelihood that the petitioner would have been acquitted. See footnote 7 of this opinion.

The importance of the petitioner's alibi defense is also reflected in how vigorously the state opposed it. State's Attorney Benedict claimed that it had been concocted by the Skakel family and founded on the perjurious testimony of the petitioner's alibi witnesses. Benedict spent a considerable amount of time, both in adducing testimony from the state's witnesses and in cross-examining the petitioner's witnesses, as well as during closing argument, attempting to demonstrate that the petitioner's alibi had been fabricated. It is likely that Benedict challenged the petitioner's alibi so aggressively because, as the Supreme Court of New Jersey has observed, "few defenses have greater potential for creating reasonable doubt as to a defendant's guilt in the minds of [the jurors than an alibi]." (Internal quotation marks omitted.) *State* v. *Porter*, 216 N.J. 343, 353, 80 A.3d 732 (2013).

Next, the testimony that Ossorio could have provided was unquestionably essential to the petitioner's alibi defense. That testimony, which the habeas court expressly credited, placed the petitioner at the Terrien residence during the relevant time frame on the evening of October 30, 1975, thereby fully corroborating the testimony of the petitioner's other alibi witnesses. But Ossorio's testimony, while corroborative, certainly was not cumulative, because the petitioner's other alibi witnesses were either siblings or cousins of the petitioner. Although Ossorio was friendly with Dowdle in the mid-1970s, there is no indication that he had maintained any ties to her or the Skakel family over the years, and, thus, he would have been an independent and unbiased witness with no motive to lie about seeing the petitioner at the Terrien home on the evening of October 30. Benedict emphatically and persistently maintained that the jury should not credit the petitioner's alibi because all of

the alibi witnesses were closely related to the petitioner and were lying to protect him. In light of this contention by the state, credible testimony from Ossorio would have been absolutely critical, both to establish the credibility of the alibi generally and to demonstrate the credibility of the petitioner's witnesses more specifically. Indeed, if believed, Ossorio's testimony would have disproved Benedict's contention that the Skakel family had created the fictitious alibi to protect the petitioner and then continually lied, under oath and otherwise, in furtherance of the fraudulent scheme. Thus, with respect to the petitioner's alibi defense, the quantum of evidence already known to Sherman—evidence marked by the weakness inherent in any alibi defense comprised solely of the testimony of family members—should have prompted Sherman to investigate the lead provided by Dowdle. See, e.g., *Wiggins* v. *Smith*, supra, 539 U.S. 527 ("[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

In addition, as I discussed previously, the state adduced testimony from Ix, Shakespeare, and Julie Skakel in an effort to discredit the petitioner's alibi defense. Testimony from a neutral, objective and credible witness like Ossorio would have gutted the testimony of those state witnesses, testimony that no doubt appeared far more significant in light of the state's contention that the petitioner's alibi witnesses all were lying. In fact, it seems clear that the jury was influenced by the testimony of Ix, Shakespeare and Julie Skakel because the jury, during its deliberations, asked that the testimony of those witnesses, insofar as it related to the petitioner's alibi, be read back.

Along the same lines, Ossorio's testimony also would have refuted Benedict's claim that the alibi was an integral part of a broader Skakel family scheme to cover up for the petitioner. According to Benedict, this scheme was hatched immediately after the victim's murder and began with the disposal of incriminating evidence and the trip to Windham, New York, continued with the petitioner's enrollment at the Elan School in Maine, and, thereafter, was exemplified by his allegedly self-serving statements to Richard Hoffman, the ghostwriter assisting the petitioner with his book, and, finally, culminated in the perjurious grand jury and trial testimony of the petitioner's alibi witnesses. Because the allegedly fraudulent alibi provided the foundation for Benedict's claim of a grand family scheme, Ossorio's credible testimony demonstrating the validity of the alibi also would have debunked Benedict's broader conspiracy theory.

Yet another consideration that the majority fails to consider is the ease with which Sherman could have

ascertained that Ossorio had critical alibi testimony to offer, such that even the most rudimentary of inquiries would have led Sherman directly and immediately to Ossorio. See, e.g., *Rompilla* v. *Beard*, supra, 545 U.S. 389–90 (explaining that "[t]he unreasonableness of attempting no more than [counsel] did was heightened by the easy availability of the [material evidence]"). Upon reading Dowdle's grand jury testimony and learning that her "beau" was with her at the Terrien residence on the evening of October 30, 1975, all Sherman had to do was pick up the telephone and ask Dowdle—his own alibi witness—to identify her "beau." And then, after learning that her "beau" was Ossorio, it would have been easy for Sherman to locate and speak to him—indeed, a look in the telephone listings and another telephone call would have sufficed—because he lived just a few miles from Sherman's office. As in all criminal cases that involve the issue of defense counsel's failure to interview a potential witness to ascertain what he or she has to say, counsel has no absolute obligation "to actually track down" the witness, "only that he put in a reasonable effort to do so." *Avery* v. *Prelesnik*, 548 F.3d 434, 438 (6th Cir. 2008), cert. denied, 558 U.S. 932, 130 S. Ct. 80, 175 L. Ed. 2d 234 (2009); see also id. ("There is no reason based on professional judgment why [defense counsel] would not have pursued speaking to [the potential alibi witness]. The [D]istrict [C]ourt correctly concluded that [defense counsel] was under a duty to reasonably investigate, which entails, at the bare minimum, asking for [the potential alibi witness' telephone] number or address and reasonably attempting to contact him." [Internal quotation marks omitted.]). In the present case, the most elementary and obvious of inquiries by Sherman or his investigator would have revealed that Ossorio was a critical alibi witness, and Sherman's unwillingness to take even those modest steps unreasonably deprived the petitioner of Ossorio's crucial trial testimony.

Consequently, this is not a case that required Sherman to devise a plan "to balance limited resources in accord with effective trial tactics and strategies." *Harrington* v. *Richter*, supra, 562 U.S. 89; see also *Rogers* v. *Zant*, 13 F.3d 384, 387 (11th Cir.) ("[the] correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources"), cert. denied, 513 U.S. 899, 115 S. Ct. 255, 130 L. Ed. 2d 175 (1994). Taking his investigation into Ossorio's identity, whereabouts and possible testimony one step at a time, Sherman would have been able to successfully complete the investigation in two easy steps and at negligible expense. But, even if that were not so painfully apparent, the petitioner paid Sherman more than $2 million in legal fees, and so the cost of undertaking reasonable steps to locate Ossorio, a potentially critical witness, certainly was not an issue.

Finally, as a general matter, an adequate pretrial investigation is required in all criminal cases. But common sense dictates that, when the stakes are highest—when the criminal charges are most serious, exposing the defendant to the most lengthy of prison terms—the importance of a thorough pretrial investigation is that much greater. In the present case, both the gravity of the charged offense, murder, and the magnitude of the potential maximum sentence, life imprisonment, are obvious. In such circumstances, the responsibilities of defense counsel are especially great, commensurate with the heightened exposure, concerns and expectations of the defendant. Defense counsel must be particularly attentive to detail, because the defendant's life is on the line. Of course, the gravity of the murder charge placed Sherman on notice that he needed to put appropriate time, thought and effort into the case. He clearly did not live up to professional norms, however, in failing even to contact Dowdle after reading her grand jury testimony and learning that her "beau" was at the Terrien home, with her, on the evening of October 30, 1975.

### 3
### The Majority Cannot Justify Sherman's Grossly Inadequate Handling of the Petitioner's Alibi Defense

The majority goes to great lengths in trying to rationalize Sherman's indefensible failure to follow up on Dowdle's grand jury testimony, which identified her "beau" as a potential, independent alibi witness. The majority's attempt to justify Sherman's decision to forgo even the most rudimentary and self-evident steps to find out if Ossorio could corroborate the petitioner's alibi—steps that, if taken, would have put Sherman in touch with Ossorio immediately—is both unavailing and troubling.

The majority first argues that it was reasonable for Sherman to believe, in spite of Dowdle's testimony to the contrary, that her unnamed "beau" actually was not present with her at the Terrien residence on the evening of October 30, 1975, because neither the petitioner nor his alibi witnesses had mentioned anything to Sherman about Dowdle's "beau." Even if this argument was predicated on an accurate rendition of the facts,[9] it is based on a fundamental misunderstanding of the timeline of this case.

It is undisputed that the petitioner was never considered a suspect in the victim's murder before the mid-1990s; rather, he was considered only a potential witness before that time. Indeed, State's Attorney Benedict acknowledged this fact at trial, noting that, until the 1990s, no witness had ever been asked to account for the petitioner's whereabouts or movements on the night of the murder because the police never suspected his involvement in the crime. Two events occurred in the

1990s that caused the petitioner to fall under suspicion: the theft of the Sutton files, in 1995, which revealed that the petitioner had changed his account of his activities on the night of the murder, and the publication of a book by Mark Fuhrman, in 1998, in which Fuhrman claimed to have solved the long, unsolved murder by being the first to suspect the petitioner's involvement in it. Fuhrman urged that a grand jury be empaneled immediately to investigate his theory. Shortly thereafter, a grand jury was empaneled, and, in July, 1998, the petitioner hired Sherman to represent him in connection with that proceeding. Dowdle was called before the grand jury two months later, on September 22, 1998, at which time she was asked about her recollection of the evening of October 30, 1975. Dowdle explained that she was at home with her "beau."

Accordingly, and contrary to the assertion of the majority, the existence of a potential, independent alibi witness for the petitioner was revealed *as soon as the petitioner became a suspect in the murder*, by the only person who was likely to recall after so many years that such a person even existed. Given the belated development of the case against the petitioner, Sherman should have known that it was possible—even likely—that neither the petitioner nor the other alibi witnesses recalled or had given any thought to whether Ossorio—or anyone else—was at the Terrien residence on the evening of October 30, 1975. It is apparent, for instance, that even Dowdle failed to appreciate the significance of Ossorio's presence at her home, either when she testified before the grand jury or when she again mentioned him at the petitioner's criminal trial four years later. In any event, there are many reasonable explanations why the petitioner and his alibi witnesses did not volunteer information about Ossorio to Sherman immediately after he was retained by the petitioner, but there is simply no justification for Sherman to have concluded that Dowdle was mistaken about the presence of her "beau" at the Terrien home, or, if her "beau" was there with her, that he would not know whether the petitioner also was present at that time. The only rational thing for Sherman to do to clarify any confusion that he may have had about Dowdle's testimony would have been to speak to her about the matter.[10] This is especially true in view of the fact that, at the petitioner's criminal trial, Dowdle *again* testified that she had a companion with her on the evening of October 30, 1975, this time characterizing him as a "friend." Inexplicably, Sherman failed to follow up on either reference.

The majority also contends that, despite Dowdle's reference to her "beau" in her grand jury testimony, Sherman reasonably could have believed that Ossorio was not at the Terrien home on the evening of October 30, 1975, because he had never been named in the many police reports that were generated after the murder. The majority asserts that the absence of Ossorio from

these reports rendered Dowdle's reference to him as aberrational and, therefore, somehow insignificant. This contention, too, is baseless, and for much the same reason. Because the petitioner did not become a suspect until more than twenty years after the murder, police investigators simply were not concerned about the petitioner's whereabouts during the twenty year period in which the vast majority of the police interviews were conducted. Until the petitioner became a suspect, there was never any reason for the police to seek a complete accounting of all individuals present at the Terrien home on the evening of October 30, 1975. Thus, the majority is unable to cite a single report in which Ossorio likely would have been identified in the course of the interview. In fact, there is no such report because, as Benedict expressly acknowledged at trial, until the 1990s, witnesses had never been asked to account for the petitioner's whereabouts on the night of the murder for the simple reason that no one who indicated being at the Terrien home on the evening of October 30, including the petitioner, ever was a suspect before that time. In other words, the majority's suggestion that Dowdle's reference to her "beau" is aberrational assumes without any evidentiary support that there was a context in which Ossorio's name—or the name of anyone else who was visiting or working at the Terrien home on October 30—would have come up during the first twenty years of the investigation. The simple fact of the matter is that Ossorio's name would have come up *only* if the police had suspected that the petitioner, Rushton Skakel, Jr., John Skakel, or Terrien did not go to the Terrien home as reported and, therefore, had asked them whether anyone could vouch for their presence there.

In this respect, the present case is governed by the principles announced in *Rompilla* v. *Beard*, supra, 545 U.S. 383, in which defense counsel was deemed to have rendered constitutionally deficient assistance by failing to review more thoroughly certain evidence in the prosecutor's possession. In addressing the dissent's primary argument, the court stated: "The dissent would ignore the opportunity to find this [mitigating] evidence on the ground that its discovery . . . rests on serendipity . . . . But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation or red flags simply because they were unexpected." (Citation omitted; internal quotation marks omitted.) Id., 391 n.8. That is precisely the situation in the present case: Sherman concededly had an obligation to review Dowdle's grand jury testimony with reasonable care, and once having done so, he could not ignore the obvious red flag raised by that testimony, namely, that Dowdle was accompanied by her "beau" at the Terrien residence on the evening of October 30, 1975.[11]

The majority next tries to convince us that it was reasonable for Sherman to infer that, because Dowdle indicated in her grand jury testimony that she mostly stayed in the library that evening and had not seen the Skakel brothers herself, Ossorio, too, did not have occasion to see who was watching television in an adjacent room. This argument, too, is based on the unsupported assumption that Ossorio stayed put in the library all evening, even when Dowdle went to put her daughter to bed. The fact is that Sherman had no idea whether Ossorio remained in the library, wandered around the house, spent time in the television room or otherwise bumped into the Skakel family members during the ninety minutes or so that they were all together in the Terrien residence. Of course, the only way for Sherman to have found out is to have asked Ossorio, but, inexplicably, he made no effort to do so.

The majority also asserts that Sherman reasonably could have believed that Ossorio likely would not be able to recall what occurred on the evening of October 30, 1975, because Sherman could not have interviewed him until Sherman was retained in 1998, some twenty-three years after the relevant events. To buttress this argument, the majority observes that Ossorio had not been questioned or otherwise come forward in those twenty-three years, lending support to the inference that he would not be able to remember who was present at the Terrien home that evening. Again, although Ossorio might not have remembered whether the petitioner was at the Terrien home on October 30, he well might have. And, indeed, he did. Sherman obviously could not rule out that possibility, and he made no effort to do so—if he had, he would have learned that Ossorio did, in fact, see the petitioner there that evening. Under the majority's logic, Sherman had no duty to make *any* effort to follow up on *any* lead about *any* new or additional alibi witness—or any kind of witness, for that matter—because he reasonably could have concluded that no such witness was likely to remember events from more than two decades beforehand. Of course, the case concerned events long in the past, and, so, both the state and the defense were required to do their best to develop facts based largely on memory and recall. Indeed, this case never could have been brought but for the state's ability to locate witnesses who could remember and testify about events that had occurred decades earlier. Sherman's job in defending the petitioner necessarily required him to undertake the same investigation. The majority, however, agrees with the respondent that it was reasonable for Sherman to forgo an investigation into Ossorio due to the lapse of time. This argument makes no sense to me, and I simply cannot see why the majority finds it persuasive.

Finally, from my perspective, the majority's attempt to rehabilitate Sherman's representation of the peti-

tioner misses the point altogether. As I discussed previously, when a defense attorney represents a defendant in a murder case involving an alibi, the dictates of the sixth amendment—that the attorney take reasonable steps to advance that alibi—are coextensive with common sense; after all, reasonableness and common sense are closely related. And it defies common sense to conclude that it was perfectly reasonable for Sherman to decide that he need not even speak to Dowdle about her "beau" because he felt there was a likelihood that any such inquiry would prove to be unproductive. The fact is, of course, that there was absolutely no reason for Sherman even to attempt to evaluate the likelihood that Ossorio could or could not provide important alibi testimony; the *only* reasonable thing for Sherman to do was to *ask* Ossorio, which he readily could have done but elected not to do. That the majority defends Sherman's inexplicably poor and prejudicial decision making with respect to Ossorio, and concludes that it somehow comports with the petitioner's right to the effective assistance of counsel, is indeed baffling.

### 4

### The Majority's Position Has No Support in Applicable Precedent

In support of its argument that, under all the facts and circumstances, it was reasonable for Sherman to "overlook or disregard" Dowdle's "singular reference" to her "beau" in her grand jury testimony, the majority suggests that courts have not found counsel ineffective for failing to interview an alibi witness when the defendant did not bring that witness to the attention of counsel. The majority is entirely mistaken both in its ultimate conclusion and in its reading of the relevant case law.

As the majority appears to concede, it is generally *not* reasonable for counsel to fail to investigate potential alibi witnesses identified by a client. See, e.g., *Mosley* v. *Atchison*, 689 F.3d 838, 849 (7th Cir. 2012); *Grooms* v. *Solem*, 923 F.2d 88, 90 (8th Cir. 1991); *Vazquez* v. *Commissioner of Correction*, 107 Conn. App. 181, 185–86, 944 A.2d 429 (2008). By the same token, "[d]efense counsel is not required . . . to investigate everyone whose name happens to be mentioned by the defendant." (Internal quotation marks omitted.) *Nealy* v. *Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985). The majority is manifestly incorrect, however, insofar as it appears to assert that counsel is not ineffective in failing to investigate an alibi witness *unless* the defendant provides counsel with the witness' name. Contrary to the majority's suggestion—and to common sense, as well—the key consideration is not whether the client has mentioned the witness to counsel but whether a reasonably diligent and effective lawyer, once apprised of the existence of a potentially critical witness, could make a "reasonable professional [judgment]" that it was nonetheless unnecessary to contact the witness

or otherwise to pursue that line of defense. (Internal quotation marks omitted.) *Wiggins* v. *Smith*, supra, 539 U.S. 533. Of course, the answer to that question is "no."

The majority cites *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664, in particular, for the proposition that counsel's failure to investigate an alibi witness renders his performance deficient only when he has been provided with the witness' identity and has "reason to believe that the witness might have helpful information to give." *Gaines* stands for no such proposition and cannot arguably be read as the majority does. In that case, the petitioner, Norman Gaines, was completely unable to remember his whereabouts on the night of the crime or to remember a single witness who might attest to them. *Gaines* v. *Commissioner of Correction*, supra, 675. Nonetheless, this court found that his defense attorney's representation was ineffective insofar as he failed to interview either of the only two individuals that Gaines mentioned as people he knew in Bridgeport, where the crime occurred, even though Gaines *never suggested that they might have information helpful* to his defense. Id., 685–87.

*Gaines*, therefore, hardly stands for the proposition that counsel need not investigate witnesses who have not been identified by the client. To the contrary, *Gaines* clearly illustrates why Sherman was manifestly ineffective insofar as he failed to look into Dowdle's "beau." First, in *Gaines*, we noted how easy it would have been to contact the potential witnesses. See id., 685–86 ("no . . . extensive investigation, based wholly on conjecture, was necessary to discover or to contact [the witness]"). In the present case, as I explained, it can hardly be said that contacting Ossorio would have been any more difficult.[12] Second, in *Gaines*, we emphasized that counsel was responsible for making a context specific assessment of the value of potential witnesses, completely apart from the assessment made by Gaines. See id., 684 ("[Gaines'] failure to indicate explicitly that [the witness] possessed information that would be helpful to his case did not relieve [counsel] of his duty to interview [the witness]. Criminal defendants are guaranteed effective assistance of counsel, including adequate pretrial investigation, because they require the skill and knowledge of an individual trained in the adversarial process to identify the most important witnesses and evidence in order to present the most effective defense."). In the present case, just as in *Gaines*, Sherman immediately should have recognized the potential value of Ossorio's testimony, even though he was not identified by the petitioner. Indeed, the possibility that a person identified as being *at the scene* in question would remember who else was there—like in the present case—is hardly more remote than the possibility, as in *Gaines*, that a person that Gaines knew, though *not placed with him* on the night of the crime, would in fact have been moving her belongings with

Gaines on a particular night five months earlier, and would also happen to remember that fact. See id., 671, 686–87. Furthermore, just as in *Gaines*, the fact that Ossorio *might not* have ended up providing useful information is entirely beside the point. Given the potential value of his testimony and the ease with which it might have been acquired, there is simply no justification—none whatsoever—for Sherman's decision not to investigate further.

In fact, the majority's unsupported contention to the contrary notwithstanding, courts have consistently recognized that effective counsel cannot limit his investigation to those leads presented by the client himself, but, rather, counsel has an independent duty to investigate potential alibi witnesses not suggested by the client. In *Bigelow* v. *Haviland*, supra, 576 F.3d 284, for instance, the Sixth Circuit held that counsel "had no reasonable basis for assuming that [the petitioner's] lack of information about still more [alibi] witnesses [aside from one already identified by the petitioner] meant that there were none to be found." Id., 288. The court observed that an attorney has a duty of investigation that goes beyond what the client himself identifies and concluded that counsel's representation was ineffective insofar as he failed to pursue such additional investigation as would have revealed the alibi witnesses. Id., 288–89. Federal case law is replete with such examples. See, e.g., *Stitts* v. *Wilson*, 713 F.3d 887, 893 (7th Cir. 2013) ("When a defendant's alibi is that he was at a nightclub at the time of the shooting, where there are presumably many people, we cannot fathom a reason consistent with [United States] Supreme Court precedent that would justify a trial counsel's decision to interview only a single alibi witness without exploring whether there might be others at the venue who could provide credible alibi testimony. There is simply no evidence in the record to suggest that exploring the possibility of other alibi witnesses 'would have been fruitless' under these circumstances." [Emphasis omitted.]), cert. denied,      U.S.     , 134 S. Ct. 1282, 188 L. Ed. 2d 299 (2014); *United States* v. *Gray*, 878 F.2d 702, 711–12 (3d Cir. 1989) (counsel was ineffective when he failed to interview unnamed potential eyewitnesses to altercation, in addition to several known witnesses); *Sullivan* v. *Fairman*, 819 F.2d 1382, 1391–92 (7th Cir. 1987) (counsel was ineffective when he made merely "perfunctory" efforts to interview witnesses noted in police reports).

The facts of this case illustrate the need for just such an independent duty. By the late 1990s, it is entirely unsurprising that the petitioner failed to recall the transitory presence of his older cousin's boyfriend nearly twenty-five years earlier. In such a situation, counsel must probe harder—to seek to fill in the gaps when the foibles of memory are likely to interfere with a defendant's full recollection of the past. See *Bigelow*

v. *Haviland*, supra, 576 F.3d 288 (counsel's duty to look beyond witnesses identified by client is especially significant when client may have trouble remembering them himself). Courts have reasonably recognized, moreover, that such duties grow increasingly acute as the gravity of the crimes charged increases. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 684 ("[g]iven the seriousness of the charges that his client faced [and the other relevant considerations], it was unreasonable for [defense counsel] not to recognize the potential that [the witness] might possess information helpful to the petitioner's case"); see also *Gregg* v. *Rockview*, 596 Fed. Appx. 72, 77 (3d Cir. 2015) ("[e]specially given the gravity of the criminal charges [the petitioner] was facing, counsel could not have reasonably elected to rely exclusively on [one witness] and forgo any investigation into [another]"); *Raygoza* v. *Hulick*, 474 F.3d 958, 964 (7th Cir.) ("[i]n a [first degree] murder trial, it is almost impossible to see why a lawyer would not at least have investigated the alibi witnesses more thoroughly"), cert. denied sub nom. *Randolph* v. *Raygoza*, 552 U.S. 1033, 128 S. Ct. 613, 169 L. Ed. 2d 413 (2007); *Bryant* v. *Scott*, supra, 28 F.3d 1417–18 ("given the seriousness of the offense and the gravity of the punishment, counsel should have tried to investigate the potential alibi witnesses"); *Coleman* v. *Brown*, 802 F.2d 1227, 1234 (10th Cir. 1986) ("[i]n light of the strong case against [the petitioner] and the seriousness of the charges, it was improper for his attorney to fail to investigate what was perhaps [the petitioner's] sole line of defense"), cert. denied, 482 U.S. 909, 107 S. Ct. 2491, 96 L. Ed. 2d 383 (1987).

Thus, there is no question that Sherman's performance was not rendered effective merely by virtue of any inability on the petitioner's part to recollect the presence of Dowdle's "beau." If Sherman was aware of Ossorio's presence and believed that his testimony might be useful, Sherman had an independent duty to investigate, regardless of whether the petitioner pointed him in that direction. The majority argues, nonetheless, that Sherman, having examined the grand jury testimony with reasonable care,[13] could justifiably have declined to investigate the potential witness on the assumption that Ossorio would not have possessed useful information. Myriad cases point in the opposite direction.

In fact, courts have often criticized attorneys who fail to investigate potential witnesses on the basis of flawed assumptions about their usefulness. See *United States* v. *Best*, 426 F.3d 937, 945 (7th Cir. 2005) ("[a]n outright failure to investigate witnesses [as opposed to the decision not to call such witnesses after investigation], is more likely to be a sign of deficient performance"); *Black* v. *Larson*, 45 Fed. Appx. 653, 655 (9th Cir. 2002) ("[a]lthough generally we defer to counsel's decision not to proffer a witness at trial, that decision

is entitled to less deference when the attorney fails to interview the witness"); *Gomez* v. *Beto*, 462 F.2d 596, 597 (5th Cir. 1972) (counsel was ineffective for failing to investigate and subpoena alibi witnesses because, among other things, "he did not believe [that] a person could remember that long ago"). In *Blackmon* v. *Williams*, supra, 823 F.3d 1105, for instance, the Seventh Circuit concluded that counsel's representation was ineffective insofar as he failed to investigate potential alibi witnesses who had attended a barbeque with the petitioner at a time relevant to the crime alleged. The Seventh Circuit roundly criticized the state court for "appear[ing] to assume that counsel knew, somehow, that the additional alibi witnesses would offer purely cumulative testimony." Id., 1104. Rather, the court observed that, "[i]f counsel never learned what the witnesses would have said, he could not possibly have made a reasonable professional judgment that their testimony would have been cumulative." (Internal quotation marks omitted.) Id.; see also *Anderson* v. *Johnson*, 338 F.3d 382, 392–93 (5th Cir. 2003) (counsel was ineffective for assuming, after reviewing state's file but without further investigation, that witness would not provide useful testimony). Courts have been similarly critical of assumptions made about a witness' ability or willingness to testify on behalf of the defendant. See *Avila* v. *Galaza*, 297 F.3d 911, 920 (9th Cir. 2002) ("[Counsel] . . . failed to identify these potential witnesses because he thought that some of the people might not make the best appearance before a jury, and because his investigator . . . told him . . . that some witnesses had been uncooperative. That witnesses *might* not cooperate or make the best appearance at trial are unreasonable bases not to identify or attempt to interview them, however. A lawyer has a duty to investigate what information . . . potential [eyewitnesses possess], even if he later decide[s] not to put them on the stand." [Emphasis in original; internal quotation marks omitted.]), cert. dismissed, 538 U.S. 919, 123 S. Ct. 1571, 155 L. Ed. 2d 308 (2003); *Schlup* v. *Bowersox*, United States District Court, Docket No. 4:92CV443 (JCH) (E.D. Mo. May 2, 1996) ("The record lacks evidence supporting trial counsel's assumption that interviewing eyewitnesses would have been fruitless because no eyewitnesses would have discussed the murder . . . . In the absence of evidence supporting trial counsel's assumption, his complete failure to interview eyewitnesses to the crime falls below an objective standard of reasonableness. Trial counsel did not have a sufficient basis for believing that investigating eyewitnesses would not benefit the defense.").

In the present case, it is readily apparent that the potential value of Ossorio's testimony was far too high for Sherman to dismiss Dowdle's reference—even a single reference—without reasonable investigative effort.[14] As the Eighth Circuit has observed, "[o]nce

a defendant identifies potential alibi witnesses, it is unreasonable not to make some effort to contact them to ascertain whether their testimony would aid the defense." *Grooms* v. *Solem*, supra, 923 F.2d 90. In that case, counsel failed to investigate a potential alibi that arose at the beginning of trial on the assumption that he would be precluded from offering any alibi witnesses on state procedural grounds. See id. In the present case, Sherman faced no such procedural barrier; he merely assumed, on the basis of the petitioner's twenty-five year old recollection, that Ossorio would be able to offer no useful testimony. Such an assumption is patently unreasonable in the circumstances presented.

In reaching a contrary conclusion, the majority relies on cases involving facts that bear no resemblance to the present case. It suggests, first, that, as in *United States* v. *Farr*, supra, 297 F.3d 658, Sherman did not act unreasonably in failing to engage in a " 'scavenger hunt' " for potentially exculpatory information with no reason for knowing what the information was or where it might be found. In *Farr*, however, the defendant had refused to cooperate with his attorney; see id., 654; and could not, on appeal, "name a single witness who could help his cause, much less identify the substance of their alleged testimony." Id., 656. Thus, the court had no reason to decide whether the defendant's counsel was ineffective; without any sense of who the witnesses were or what they might say in his defense, the court could conclude only that the defendant was not prejudiced by the missing testimony. Id., 659. In the present case, by contrast, the location and import of the potentially exculpatory information is—and always has been—beyond question. Sherman simply needed to speak to Dowdle and ask her who her "beau" was.

The majority also refers to two Eighth Circuit cases to illustrate the significance of the petitioner's failure to precisely identify Ossorio or to help Sherman locate him. But, once again, the majority fails to ascribe any value to *identifiability*, focusing narrowly on the formality of whether the defendant has fully identified the witness for the benefit of counsel. What these cases stand for, in fact, is the proposition that counsel is not required to conjure up a witness of uncertain value when that witness is not reasonably identifiable.[15] In those cases, unlike in the present case, each witness was misidentified in the police reports—a barrier to investigation that, without the aid of the defendant, counsel had failed to surmount. See *Battle* v. *Delo*, 19 F.3d 1547, 1555 (8th Cir. 1994), amended on other grounds, 64 F.3d 347 (8th Cir. 1995), cert. denied sub nom. *Battle* v. *Bowersox*, 517 U.S. 1235, 116 S. Ct. 1881, 135 L. Ed. 2d 176 (1996). Furthermore, counsel in at least one of these cases, unlike Sherman, *did* make efforts to investigate the misidentified witness. See *Harris* v. *Bowersox*, 184 F.3d 744, 756–57 (8th Cir. 1999), cert. denied, 528 U.S. 1097, 120 S. Ct. 840, 145

L. Ed. 2d 706 (2000). In any event, both cases are inapposite: in the present case, there was no impediment to investigation. Sherman, unlike counsel in *Harris*, simply failed to try.[16]

This failure to investigate, as I explained, was not the product of strategic thinking; it was the result of unfounded and unsupportable assumptions about the value of a potentially critical alibi witness in a murder case. However sparse the references to Ossorio, this is not a case in which counsel was at liberty to ignore them or to risk miscalculating their potential significance. Rather, it was his constitutional responsibility to take reasonable steps to ascertain Ossorio's identity and to determine his value as a witness. Sherman knew that Ossorio was the only unrelated alibi witness; see *Montgomery* v. *Petersen*, supra, 846 F.2d 413 (failure to interview only disinterested alibi witness was unreasonable); and he had no real basis, aside from conjecture, for concluding that Ossorio would not prove to be a useful witness. See, e.g., *State* v. *Sanford*, 24 Kan. App. 2d 518, 523, 948 P.2d 1135 (failure to question potential witnesses was unreasonable when counsel merely "believed that they would be hostile witnesses"), review denied, 262 Kan. 967 (1997). Armed with the knowledge of a potentially critical breakthrough, it is inconceivable that a competent attorney would decline to make even perfunctory efforts to contact such a witness. In cases like these, courts have not hesitated to find that counsel's assistance did not satisfy the requirements of the sixth amendment. Neither should we.

### D

### Conclusion

When Sherman learned from Dowdle's sworn grand jury testimony that another person, subsequently identified as Ossorio, was present at the Terrien home on the evening of October 30, 1975, Sherman simply elected to disregard that testimony. He did so, even though he did not know whether Ossorio could corroborate the petitioner's alibi and even though he could have found out in no time and with virtually no investigative effort that Ossorio could, indeed, provide critical alibi testimony. In not bothering to follow up on Dowdle's testimony, Sherman disregarded his professional obligation to investigate critical prosecution evidence, thereby engendering "a breakdown in the adversarial process that our system counts on to produce just results." *Strickland* v. *Washington*, supra, 466 U.S. 696. It is nothing short of astonishing that the majority approves of Sherman's game of Russian roulette, with the petitioner's freedom at stake, as consonant with the constitutional guarantees of a fair trial and the effective assistance of counsel.

### II

SHERMAN'S FAILURE TO RAISE A THIRD-PARTY

## CULPABILITY DEFENSE AGAINST
## THOMAS SKAKEL

I also must register my strong objection to the majority's determination that the habeas court incorrectly concluded that Sherman's representation was constitutionally deficient insofar as he failed to pursue a third-party culpability defense[17] against Thomas Skakel in light of Thomas Skakel's highly incriminating admissions in Sherman's presence and in the presence of Sherman's associate, Throne, on the eve of the petitioner's criminal trial. Eight days before that trial, Thomas Skakel admitted to Sherman and Throne that he had lied to the police in 1975 when he told them that the victim left his house at 9:30 p.m. Thomas Skakel admitted that, in fact, he and the victim had a sexual encounter in his backyard that lasted until at least 9:50 p.m., placing Thomas Skakel with the victim at the likely time of her death. Indeed, the victim was found with her pants and underwear down around her knees, which is completely consistent with Thomas Skakel's statement about his sexual contact with her.

The majority concludes that Sherman's decision to implicate Littleton rather than Thomas Skakel was objectively reasonable, but not because the evidence implicating Littleton was strong. It was not. In fact, it was nonexistent. The majority concludes, rather, that the evidence adduced at the habeas trial did not support the habeas court's finding that Thomas Skakel discussed his sexual encounter with the victim when he met with Sherman and Throne in 2002 and, therefore, that the evidence did not support the habeas court's finding that Sherman could have called Throne to the stand to testify about Thomas Skakel's admissions. The majority also concludes that the habeas court's finding that Throne could have testified about the admissions was "entirely speculative" in light of Throne's inability, at the petitioner's 2013 habeas trial, to remember the specifics of what was discussed at the 2002 meeting, apart from the fact that Thomas Skakel admitted to having lied to the police about when he last saw the victim. The majority finally concludes that, even if Thomas Skakel discussed his sexual liaison with the victim with Throne and Sherman, and even if Throne would have recalled that discussion long enough to testify about what Thomas Skakel told them at the petitioner's criminal trial one week later, Sherman's decision not to pursue a third-party defense inculpating Thomas Skakel was objectively reasonable as a strategic matter. Specifically, the majority contends that apprising the jury that Thomas Skakel had changed his story after twenty years and admitted to having a sexual encounter with the victim minutes before her death ran the risk of strengthening the state's theory regarding the petitioner's motive for killing the victim. None of the majority's conclusions withstands scrutiny.

Before addressing each of the majority's conclusions in turn, however, it is necessary to compare the evidence implicating Littleton with that which pointed to Thomas Skakel as the killer. The majority's recitation of that evidence omits many essential facts that bear directly on the objective reasonableness of Sherman's decision to raise a third-party culpability defense against one and not the other. When such a comparison is made, however, it is manifestly clear that Sherman's decision to implicate Littleton was entirely unreasonable given the dearth of evidence connecting him to the murder and the multitude of facts pointing to Thomas Skakel's involvement, all of which were known to Sherman before the petitioner's criminal trial. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 513, 964 A.2d 1186 ("a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" [internal quotation marks omitted]), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

It is also clear that Sherman's decision prejudiced the petitioner because it deprived him of the opportunity to demonstrate to the jury that someone other than he had the motive, means and opportunity to kill the victim, the raison d'être of a third-party culpability defense. No such argument could be made against Littleton, and Sherman's meager attempt to do so was justifiably excoriated—even ridiculed—by the state. And with good reason: as the habeas court observed, "Sherman essentially abandoned any third-party culpability claim in his jury argument," whereas the halfhearted argument that he did make "actually harmed the defense" because it communicated to the jury that Sherman himself put no stock in it.

A

The Kenneth Littleton Evidence

At the time of the victim's murder, Littleton, a then twenty-four year old graduate of Williams College with no known history of mental illness or violence, was completing his second month of teaching and coaching at the Brunswick School (Brunswick), a private school in Greenwich. Shortly after his arrival at Brunswick, the headmaster informed him that the petitioner's father, Rushton Skakel, Sr., was in need of a live-in tutor for his children. Littleton accepted the position and, as fate would have it, spent his first night in residence at the Skakel home on October 30, 1975, the night of the murder, arriving there at approximately 4:30 p.m. Because Rushton Skakel, Sr., was out of town at the time, Littleton's duties included babysitting for the younger Skakel children, nine year old Stephen Skakel and twelve year old David Skakel, until their father's return. There is

no evidence that Littleton, who had just moved to Greenwich to teach, had ever been to the Skakels' neighborhood prior to the evening of October 30, 1975, or had ever met or laid eyes on the victim. This fact alone eliminated him as a suspect for most of the officers involved in the investigation based on the widely held belief that only someone familiar with the victim and the neighborhood would have known to conceal the victim's body under the pine tree behind her parents' house, or would have been able to locate that tree in the dark. Sherman was also aware that the petitioner's sister, Julie Skakel, had observed Littleton in the Skakels' kitchen, at approximately 10 p.m., the victim's time of death as established by the substantial weight of the evidence at trial, and as argued by the defense.

The Greenwich police followed numerous leads in the months and years following the murder. In 1976, the police prepared an arrest warrant charging Thomas Skakel with the victim's murder based, in part, on false statements that he had given to them following the murder, his history of mental instability and violence, and because he was the last person to be seen with the victim prior to her death. The warrant was never approved, however, and the case ultimately went cold for nearly fifteen years.

At the most basic level, therefore, Littleton made for an unlikely target, and, for a long period of time, he was treated as such. In 1991, however, the Office of the State's Attorney reopened the investigation, and suspicion soon fell on Littleton, who, in the intervening years, had developed a severe alcohol addiction and had been diagnosed with bipolar disorder, which caused him to act erratically at times. In 1991, Detective Frank Garr and Inspector John F. Solomon traveled to Canada to interview Littleton's former wife, Mary Baker, in the hope that she might be able to shed light on the investigation. Baker agreed to assist Garr and Solomon because she "thought it was the right thing to do," even though she did not believe Littleton had anything to do with the victim's murder. Initially, Baker simply recorded her telephone conversations with Littleton, during which she would ask him questions about the murder. According to Garr, he and Solomon "guided [Baker with respect to] how to proceed with these conversations between her and her [former] husband in the attempt to get him to open up and discuss the crime and possibly his complicity in it." Specifically, Garr and Solomon "suggested to her" what to say "to see what type of a response" it would elicit from Littleton. According to Garr, this approach never elicited a single incriminating response.

In December, 1991, Baker agreed to go to Boston, Massachusetts, and meet with Littleton in person, at a hotel, under the pretext of discussing the possibility of getting back together with him. The plan called for

Baker to tell Littleton that the reason she was reluctant to get back together with him was because, several years earlier, while she and he were driving through Connecticut on their way to Massachusetts, he had confessed to the victim's murder during a drunken blackout.

Littleton, who wanted very much to reunite with Baker, agreed to the meeting. A transcript of their conversation, which was secretly recorded by the police, was provided to Sherman prior to trial. As planned, Baker began the conversation by telling Littleton about his so-called admissions. Shocked by the news, Littleton strenuously denied any involvement in the victim's murder, insisting that he never laid eyes on her "that night or ever . . . ." Littleton also told Baker that he was willing to do whatever it took to convince her of his innocence, including submitting to a "sodium pentothal" test administered by the Greenwich police, which he hoped might finally answer a question that had vexed the police at the time of the murder. Littleton explained that "the key thing that they were interested in [was] what [Thomas Skakel] was wearing when he came into the room to watch [television later in the evening]. And I couldn't tell them that." Littleton testified that "this was a big key point they really hammered . . . but I couldn't remember [if Thomas Skakel] was wearing something different . . . versus what he was wearing earlier in the evening."

After his meeting with Baker, Littleton agreed to meet with Kathy Morall, a forensic psychiatrist retained by the Greenwich police to evaluate him as a possible suspect. At the time of their meeting, Littleton was unaware of the ruse that the police and Baker had played on him in Boston. During their first meeting, Littleton told Morall of the "frightening" news that he had received from Baker. Specifically, Littleton informed Morall that Baker had told him that, during a trip through Connecticut, "I was blacked out for about [one] hour to [one] hour and fifteen minutes. . . . [Baker] said that I was in the backseat . . . . She told me that I said I did it." At their next meeting, while discussing the same car ride, Littleton reminded Morall, "I told you this, you know, it's kind of frightening but . . . this is when I said, I did it. . . . [Baker] heard me." This statement, "*this is when I said, I did it*"; (emphasis added); provided the crux of Sherman's third-party culpability defense against Littleton. During his cross-examination of Littleton at the petitioner's criminal trial, Sherman asked Littleton whether he had ever told Morall that he had told Baker, "I did it," meaning that he had murdered the victim. Littleton answered, "[y]es." Littleton explained, however, that he had only said that to Morall because that is what Baker had told him, not because he had any memory of confessing to the victim's murder. Littleton testified that it never occurred to him at the time of his meeting with Morall

that Baker, a person whom he loved and trusted, would lie to him about such a thing.

Convinced beyond any conceivable doubt that Littleton had absolutely nothing to do with the murder, the state granted him full immunity—effectively exonerating him in the eyes of the jury—and, at trial, completely discredited Sherman's unpersuasive attempt to depict Littleton as a suspect. The state's task was not a difficult one in light of Baker's testimony, corroborated by Garr and Solomon, that everything she had told Littleton was part of a ruse, as State's Attorney Benedict put it, "to dupe [a] psychologically fragile person to confess to [a] crime [he did not commit] . . . ." Benedict explained that, in 1992, Garr and Solomon got it into their heads that they were "going to break the case by tricking . . . Littleton into confessing. . . . There is no question that [their plan] . . . was a complete flop." Benedict further argued that, obviously, "the evidence of Littleton's interview by Morall was simply a product of his having been hoodwinked in Boston. For counsel to suggest to you here that what Littleton said to Morall is a confession is really treating you no differently than the police treated Littleton . . . in 1992."

By the end of the petitioner's criminal trial, Sherman himself effectively conceded that his attempts to inculpate Littleton were not merely fruitless for his client but fundamentally baseless as a strategic matter, as evidenced by his assertion that he had "no clue, no clue" whether Littleton was responsible for the victim's murder. Moreover, Sherman stated, in referring to Littleton's so-called "confession," "[a]t the very least, what we learned from . . . Littleton is, you know, a confession ain't always a confession, is it," clearly expressing the view that Littleton's supposed confession was hardly that. In fact, at one point during his closing argument, Sherman quite reasonably stated that "whoever did [commit] this crime . . . should rot in hell." But shortly thereafter, when again discussing Littleton, Sherman stated that, "I thought that he was a very pathetic creature. I felt very badly for him. I don't think I beat him up too much on the stand." At another point, Sherman argued to the jury that the state should be "comforted by the fact" that it "didn't make the wrong decision by arresting . . . Littleton." One is left only to observe that it is hard to imagine a closing argument that does more to undermine a key aspect of a party's claim.[18] As the habeas court generously noted, Sherman's bizarre closing argument "essentially eviscerated" any third-party culpability defense predicated on Littleton's commission of the murder[19] and was itself deficient.[20]

As the habeas court further concluded, when the Littleton evidence is compared to the powerful evidence implicating Thomas Skakel, Sherman's failure to assert a third-party culpability defense against Thomas Skakel

"was and is inexplicable" and "cannot be excused as a reasonable exercise of judgment or [as] a matter of trial strategy." Even "[i]f Sherman was, in fact, committed to the notion that only one third-party culpability defense should be asserted, a proposition [that] may well be within trial counsel's informed discretion, he unreasonably chose a third party against whom there was scant evidence and ignored a third party against whom there was a plethora of evidence." I turn to the latter evidence now.

## B

### The Thomas Skakel Evidence

At the time of her death, the victim had been acquainted with Thomas Skakel and the petitioner for approximately eight weeks. It is undisputed that Thomas Skakel was the last person to be seen with her prior to her death. Seven different witnesses reported seeing them alone in his driveway at approximately 9:30 p.m. In a tape-recorded interview following the murder, the victim's friend, Ix, reported that, on the night of the murder, at approximately 9:15 p.m., she, the victim, the petitioner and an eleven year old boy named Geoffrey Byrne were seated in the Skakels' Lincoln Continental in the Skakel driveway talking, when Thomas Skakel came outside and joined them. At that time, the petitioner's older brothers, John Skakel and Rushton Skakel, Jr., and their cousin, Terrien, approached the car and told them that they needed to use it to drive Terrien home. When asked by the police whether everyone got out of the car at that point, Ix responded: "Not everyone. Just [Thomas Skakel], and me, and [the victim and Byrne]." Ix reported that she and Byrne then left for their respective homes, and, as they were leaving, the victim stated, "I'm going home in a few minutes," too. Both Ix and Byrne reported that, as they were walking out of the driveway, "they observed Thomas [Skakel] push [the victim]," causing her to "[trip] over a small steel curbing surrounding a planted area." Ix and Byrne "reported that they did not see [the victim] return to the driveway" after that.

The victim's mother telephoned the Greenwich police at 3:48 a.m. on October 31, 1975, to report the victim missing. During that telephone call, she reported that the victim had been "expected home at 9:30 p.m." and "had never been late like this before." She also reported that she had called several of the victim's friends before calling the police and had been told by one to "check with the . . . Skakels . . . ." The victim's mother reported that she then "called the Skakel residence . . . and spoke to Thomas [Skakel]," who told her that he last saw the victim at approximately 9:30 p.m. on October 30, and that the victim had told him that she was going home to do her homework. At trial, the victim's mother testified that her daughter "always came home" when expected and that her failure to do so on

the night of the murder was "an aberration."

The police interviewed Thomas Skakel following the discovery of the victim's body, and he told them that, on the night of the murder, at approximately 9:15 p.m., he went outside to his father's Lincoln Continental to get an audio cassette. When he got to the car, the petitioner, Ix, Byrne, and the victim were sitting inside the car, talking, and he decided to join them. After a few minutes, his brothers John Skakel, Rushton Skakel, Jr., and his cousin, Terrien, approached the car and told them that they were going to take Terrien home. Consistent with Ix' statement to the police, Thomas Skakel reported that he, Ix, Byrne, and the victim got out of the car and that John Skakel, Rushton Skakel, Jr., and Terrien got into the car with the petitioner and departed for Terrien's house. Thomas Skakel further stated that after he, Ix, Byrne, and the victim got out of the car, Ix and Byrne went home, leaving Thomas Skakel and the victim alone in the driveway. Thomas Skakel reported that "he talked to [the victim] for a few minutes, said goodnight, and entered [his] house [through] the side door." Thomas Skakel's sister, Julie Skakel, reported to the police that she observed Thomas Skakel enter the side kitchen door at approximately 9:25 to 9:30 p.m., as she was leaving to take her friend Shakespeare home. According to Thomas Skakel, he then went to his bedroom to complete a homework assignment on Lincoln Log cabins. Thomas Skakel further stated that, at approximately 10:15 p.m., he went to his father's bedroom and watched television with Littleton for approximately fifteen minutes. When confronted with the fact that Ix and Byrne had seen him push the victim into the bushes, Thomas initially denied that he had done so but then admitted to "horse playing." When asked whether he kissed or attempted to kiss the victim, or had had any sexual desire for the victim, Thomas Skakel answered, "no."

Thomas Skakel became the prime suspect in the victim's murder after the police learned from his teachers that he had lied about his homework assignment, and learned from Littleton that Thomas Skakel was not in his bedroom at 10 p.m. In the course of their investigation, the police also learned from a number of witnesses that Thomas Skakel was an emotionally unstable teenager who was prone to "frequent and quite sudden outbursts of severe physical violence," the apparent result of a traumatic head injury, which made him "impulsive and [susceptible] to precipitous outbursts of anger. He would rant and rave, be extremely noisy, and, on one occasion, [he] put his fist through a door." (Internal quotation marks omitted.) On other occasions, he reportedly "stabbed his brother in the head with a fork," ripped a telephone out of a wall, and "beat the crap" out of an opponent during a soccer game. Witnesses also informed the police that Thomas Skakel frequently walked around the neighborhood carrying a

golf club[21] and that, shortly after the victim's murder, his father committed him to Yale-New Haven Hospital for two weeks of psychiatric evaluation. Sherman also was aware that Thomas Skakel, by his own admission, had consumed "about four or five" beers and "one or two scotches" in the space of two or three hours on the night of the murder.

Entries in the victim's diary further revealed that, in the weeks preceding her murder, Thomas Skakel had made unwanted sexual advances toward her. In one such entry, dated October 4, 1975, the victim wrote that "[Thomas Skakel] was being an ass. At the dance he kept putting his arms around me and making moves." Allison Moore, a friend of the victim's, corroborated the victim's account of Thomas Skakel's interest in the victim, reporting to the police that, "just prior to [her death], [the victim] informed her that . . . Thomas [Skakel] wanted to date her, but that [the victim] had refused. [Moore] reported that [the victim] told her that Thomas [Skakel] was aggressive, and that [the victim] thought [Thomas Skakel was] strange." Another friend, Christine Kalan, reported that she also "was aware of the fact that Thomas [Skakel] wanted to date [the victim] but that [the victim] just liked [him] as a friend."

The timeline of the murder established by the Greenwich police was also highly incriminating with respect to Thomas Skakel. The police believed that the victim was attacked on her way home from the Skakel driveway sometime between 9:30 and 10 p.m., a conclusion based on forensic analysis of the victim's body,[22] the extreme agitation of two neighborhood dogs at the edge of the crime scene,[23] and a loud commotion heard by the victim's mother between 9:30 and 10 p.m. in the victim's yard. The commotion, which consisted of "excited voices" and "incessant barking," was so distracting that the victim's mother stopped what she was doing to look out the window. On the basis of this and other information, the police concluded: "Our assumption is that death occurred about 10 p.m., October [30], as the investigation shows that two neighborhood dogs were highly agitated shortly before 10 p.m. We feel that, even though there was no school the next day, the [victim] left the Skakel house and was headed home because her friends were not going to remain out any longer that night. We have interviewed [400] people, and no one saw the [victim] after 9:30 p.m. on the night in question. It seems highly unlikely . . . that a . . . fifteen year old female would [wander the neighborhood alone] at night."

In 1994, after Rushton Skakel, Sr., hired Sutton Associates to investigate the victim's murder; see footnote 6 of this opinion; Thomas Skakel admitted to the Sutton investigators that he had lied to the police in 1975. Although he had originally told the police that he last saw the victim in his driveway at 9:30 p.m., Thomas

Skakel now confessed that, after his brothers left to take Terrien home, he went inside the house briefly and then rejoined the victim for a sexual encounter in his backyard that lasted until 9:50 or 9:55 p.m., during which he ejaculated. When first interviewed by the investigators, Thomas Skakel stated that the victim initially "rejected" his advances but then acquiesced. In a follow-up interview, however, he portrayed the victim as the aggressor, stating that it was the victim who pursued him because "maybe she wanted more of Tommy."

Of course, Thomas Skakel's admissions to the Sutton investigators, later repeated to Sherman and Throne, placed him with the victim *after* the neighborhood dog began its frantic and violent barking a few feet from the crime scene. See footnote 23 of this opinion. Although State's Attorney Benedict, at trial, tried to minimize the import of the dog's behavior relative to the timing of the victim's murder, its significance was not lost on the Greenwich police or on any of the forensic investigators who advised them in their investigation; all of them believed that the dog's aberrant behavior corresponded with the time of the attack. Sherman also considered it a crucial piece of evidence because he argued to the jury that the dog's violent barking at 9:45 p.m. "time stamps when this crime occurred." According to the defense's own theory of how the crime unfolded, therefore, Thomas Skakel's admissions to the Sutton investigators placed him with the victim at the time of the attack.

In the course of their investigation, Sutton investigators interviewed Thomas Skakel's sister, Julie Skakel, whose account of the evening further cast doubt on Thomas Skakel's innocence. She reported that, on the night of the murder, at approximately 1:30 a.m., she received the first of several telephone calls from the victim's mother, who was trying to locate the victim. According to Julie Skakel, she went to Thomas Skakel's room to ask him if he knew where the victim might be so that she could report back to the victim's mother. Julie Skakel stated that Thomas Skakel told her that the victim had left at 9:30 p.m. and that he had to "study for a test" that night. In their suspect profile of Thomas Skakel, the Sutton investigators noted that, while there may have been an innocuous reason for Thomas Skakel to lie to the police about his sexual encounter with the victim after learning of her murder, that motive "would originate after Thomas [Skakel] knew [the victim] had been murdered. . . . When Julie [Skakel] came into his room at 1:30 a.m., however, Thomas [Skakel] was untruthful about [having a] test and when he had last seen [the victim]. . . . Many divergent and damning conclusions can be drawn when speculating about the significance of [these lies]," which were told at a time when presumably only the killer knew that the victim was dead. Thomas Skakel also lied to the victim's

mother when he spoke to her in the early morning hours of October 31, 1975. As I previously indicated, Thomas Skakel told her that the victim had left his house at 9:30 p.m., stating that she was going home to do homework.

Sherman also had firsthand knowledge of Thomas Skakel's admissions because he and Throne met with Thomas Skakel and his attorney, Emanuel Margolis, on the eve of the petitioner's criminal trial. At that time, according to Sherman's habeas trial testimony, Margolis "allowed [Sherman and Thorne] to speak to [Thomas Skakel] about anything [they] wanted . . . ." Both Sherman and Throne testified at the habeas trial that they had read the Sutton Report prior to their meeting with Thomas Skakel and were aware of the information contained in it relative to him. Sherman specifically acknowledged that he was aware that, "[o]n October 7, 1994, Thomas [Skakel] broke down in tears and informed [the] Sutton [i]nvestigators that he had, in fact, spent at least an additional twenty minutes with [the victim] behind his house. . . . They began an extended . . . twenty [minute] kissing and fondling session, which include[d] mutual fondling . . . and . . . concluded when both masturbate[d] [the other] to orgasm. At [that] point, approximately 9:50 p.m., both [the victim] and [Thomas Skakel] rearranged their clothes, and [the victim] . . . is last seen by [Thomas Skakel] hurrying across the rear lawn [toward] her home. [Thomas Skakel] stated that . . . he opened [the victim's] pants, slightly pushing them down, [and] fondled her vagina . . . . Thomas [Skakel] . . . stated [that] he soiled his clothing . . . when [the victim] brought him to . . . orgasm using her hand on his penis." Sherman testified that "[Thomas Skakel's] discussion with [him] was consistent with what was in the Sutton Report. . . . He repeated the version of events as you recited [from] the Sutton Report." Sherman stated, moreover, that he and Throne took notes during the meeting.

Throne also testified at the petitioner's habeas trial about his and Sherman's 2002 meeting with Thomas Skakel. Although he could not remember the specifics of what was said at the meeting, he did recall that it made a "significant impression" on him because Thomas Skakel admitted to having lied to the police about when he last saw the victim. In particular, Throne remembered that Thomas Skakel told them that he and the victim were together after the time that the police believed that they had parted ways.

At the habeas trial, the petitioner's habeas counsel asked Sherman why, in light of the litany of evidence implicating Thomas Skakel in the victim's murder, he did not pursue a third-party culpability claim against him, particularly given the defense's theory that the victim was attacked at 9:45 p.m. Sherman responded that Thomas Skakel "was going to invoke the fifth

amendment [privilege] no matter what we did, and I [did not think] ethically I could put him on the stand knowing that he was going to invoke the fifth amendment privilege." Sherman further testified: "I told [Thomas Skakel's attorney], I'm calling him as a witness. [Thomas Skakel's attorney] told me in no uncertain terms that he's not going to testify because he will claim the fifth amendment privilege." Specifically, Sherman stated: "I'm sorry. [I was] not the one trying . . . to protect [Thomas] Skakel, but he would not testify, and I don't think the third-party culpability issue would have worked [otherwise]." Although Sherman acknowledged that he did not believe in "putting out a buffet table of alleged suspects," he emphasized that his "[p]rime" reason for not implicating Thomas Skakel was that he did not think it would have been successful without Thomas Skakel's testimony. Sherman explained: "My client was [the petitioner]. I bore no allegiance; I bear no allegiance to anyone but [the petitioner]. If I had . . . something that I deemed was credible enough to pass [the court's] third-party culpability threshold, I would have used it. . . . I don't think we reached that threshold [with Thomas Skakel]. I don't think it was there. I wish it was."

But it was there. As the habeas court concluded, Thomas Skakel's statements against penal interest could have been presented to the jury through Throne, who readily could have been called to testify about them.[24] Of course, it would have been preferable for Sherman to have had a nonattorney witness present when interviewing Thomas Skakel because Throne could not participate in the trial both as counsel and as a witness. In this case, however, Throne undoubtedly was more valuable to the petitioner as a witness than as Sherman's inexperienced third chair at trial.[25] If necessary, Sherman also could have called Margolis to testify, since Thomas Skakel's admissions in the presence of third parties would not have been protected by the attorney-client privilege. See, e.g., *State* v. *Cascone*, 195 Conn. 183, 186, 487 A.2d 186 (1985) ("Communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice. . . . By contrast, statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality." [Citations omitted.]); see also *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994) (attorney-client privilege "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege" [emphasis omitted; internal quotation marks omitted]); *Ullmann* v. *State*, supra, 710 (attorney-client privilege "is strictly construed because it tends to prevent a full disclosure of the truth in court" [internal quotation marks omitted]).

It is apparent, therefore, that Sherman could have put Thomas Skakel's highly incriminating admissions

before the jury, either through Throne or Margolis, and that he wanted to do so as a key component of a third-party culpability defense built around Thomas Skakel. But he was unaware that the law permitted him to do so; he thought that the only way that he could make the jury aware of those admissions was through Thomas Skakel's direct testimony. It is well established that the influence of a mistake of law on an attorney's decision making cannot be characterized as a matter of trial strategy under *Strickland*. See, e.g., *Hinton* v. *Alabama*, U.S. , 134 S. Ct. 1081, 1089, 188 L. Ed. 2d 1 (2014) ("[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*"); *Williams* v. *Taylor*, 529 U.S. 362, 373, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (petitioner was denied right to effective assistance of counsel when defense counsel failed to investigate and present substantial, mitigating evidence during sentencing phase of capital murder trial, not for any tactical reason, but because he erroneously believed that law did not permit him to present such evidence). Thus, insofar as Sherman's decision not to present a third-party culpability defense centered on Thomas Skakel resulted from Sherman's mistaken belief that that defense required Thomas Skakel's testimony, the decision was not reasonable under *Strickland*.

The importance of Thomas Skakel's admissions to the defense was great. The great weight of the trial evidence established that the victim was attacked at approximately 9:45 p.m. Unlike Thomas Skakel, who could not account for his whereabouts between 9:30 and 10:20 p.m., the petitioner had a strong alibi for that time frame, which is why the state took the bold position that the petitioner's alibi witnesses were all lying to protect him. If the defense had offered the jury a plausible third-party culpability suspect, however, the jury would have viewed the state's speculative argument concerning the petitioner's alibi in a far different light.

As the habeas court noted: "[Sherman's] task . . . would not have been to convince the jury that [Thomas] Skakel committed the murder; rather, he needed only to argue that the direct and circumstantial evidence regarding [Thomas] Skakel's potential culpability should, at least, create a reasonable doubt in the minds of the [jurors] as to the petitioner's guilt. As presented, [Sherman's] defense deprived the petitioner of an opportunity for the jury to hear [Thomas] Skakel's admission of a sexual encounter with the victim, and for . . . Sherman to point out the compatibility of some aspects of this story with the physical crime scene findings regarding the victim's [state of undress]. . . . Sherman deprived the petitioner of an opportunity to present [Thomas] Skakel's consciousness of guilt [in his] change of stories, his growing sexual interest in

and aggressiveness toward the victim leading to the date of her murder, and the police awareness that he had a history of emotional instability."

The habeas court further noted: "At trial, the jury heard only that when the Lincoln [Continental] left the Skakel property, [Thomas] Skakel and the victim were standing together in the driveway. Significantly, the jury heard nothing regarding a sexual encounter between [Thomas] Skakel and the victim. However, it is reasonable to conclude that, in a competently presented third-party culpability claim regarding [Thomas] Skakel, a jury would have heard testimony that [Thomas] Skakel claimed that he had been engaged with the victim in a consensual sexual encounter to the rear of the Skakel property [until 9:50 p.m.] on October 30, 1975, during which he unfastened her [pants] and partially lowered [them] while [they both] engaged in mutual masturbation; that no living person could account for [Thomas] Skakel's whereabouts between 9:15 p.m. and approximately 10:17 p.m., when [Thomas Skakel] joined Littleton to watch [television]; that [Thomas] Skakel initially had lied to the Greenwich police about his whereabouts and activities after approximately 9:15 p.m. that evening; and [that] he had lied to [the police and] Littleton about having worked on a homework assignment in his father's room. The jury would also have heard that no one ever reported seeing the victim alive after she and [Thomas] Skakel were seen together in the Skakel driveway as the Lincoln [Continental] left for the Terrien home at approximately 9:15 p.m. Based on the availability of this evidence to . . . Sherman, [there is] little doubt that the trial court would have permitted the petitioner to assert a third-party culpability claim regarding [Thomas] Skakel." (Footnote omitted.)

Indeed, on the basis of the evidence known to Sherman at the time of the petitioner's criminal trial, Sherman could have argued persuasively to the jury as follows. Finding herself alone with Thomas Skakel in the driveway at 9:25 p.m., the victim told him that she had to leave, too, because she was due home at 9:30 p.m. Thomas Skakel then offered to walk the victim home and asked her to wait while he grabbed a jacket, or used the bathroom, since he had been drinking heavily. Such a scenario was consistent with Julie Skakel's testimony that she saw Thomas Skakel enter the house through the side door at 9:30 p.m. Thomas Skakel then rejoined the victim outside, grabbing a golf club from the bucket by the door as he left the house, as was his custom according to various witnesses. While en route to the victim's house, an intoxicated Thomas Skakel made a pass at the victim, and what may or may not have been initiated as a consensual sexual encounter between them turned suddenly violent when the victim rejected his advances or withdrew her consent for further physical contact. Infuriated by her rejection, Thomas Skakel struck the victim with the golf club,

which, in his rage, became a weapon of convenience. Consistent with the forensic evidence, the victim was able to get away from Thomas Skakel after the initial assault, but Thomas Skakel caught up with her, struck her repeatedly with the golf club and then dragged her lifeless body to the pine tree behind her house. Thomas Skakel's assault on the victim was undoubtedly the commotion that the victim's mother heard between 9:30 and 10 p.m., and the event that caused one of the neighborhood dogs to commence its incessant and plaintive barking at the entrance to the victim's driveway. Thomas Skakel then ran home, which would have taken him less than one minute according to the evidence adduced at trial, removed his bloodstained clothing and, thirty minutes later, joined Littleton to watch television with him, in an effort to establish an alibi.

Testimony by Thomas Skakel's family, friends and teachers regarding his violent temper would only have strengthened Sherman's argument, as would the victim's diary and the testimony of her friends regarding Thomas Skakel's aggressiveness toward her before her death. To reinforce his argument, Sherman needed only to remind the jury that Thomas Skakel, by his own admission, had placed himself with the victim after the neighborhood dog began its violent barking at 9:45 p.m., that he was hospitalized for two weeks shortly after the murder for psychiatric evaluation, that he had lied about his whereabouts between the hours of 9:30 and 10:20 p.m. not only to the police, but also to his sister and the victim's mother before anyone knew that the victim was dead. Sherman could have argued that Thomas Skakel's guilt was consistent not only with the forensic evidence but with the victim's last words to Ix at 9:25 p.m., that she was "going home" soon, and with the victim's mother's statement to the police that the victim had been due home at 9:30 p.m.

Finally, and perhaps most important, Sherman could have argued to the jury that this scenario required no more speculation—indeed, I would argue that it required considerably less speculation—than the state's argument with respect to the petitioner, namely, that all of his alibi witnesses were lying and that the petitioner must have jumped out of the Lincoln Continental after it left the driveway, found a golf club lying about in the dark, waited for the victim near her house, and then bludgeoned her as she entered the driveway, all because he had seen her "carrying on" with Thomas Skakel, as Benedict characterized Thomas Skakel's conduct. In short, in stark contrast to Sherman's claim that Littleton may have murdered the victim—a claim for which there was absolutely no support in the evidence—the evidence against Thomas Skakel provided an opportunity for Sherman to present a coherent and compelling third-party culpability defense—a defense that he, for no legally or strategically valid reason, failed to employ.[26]

## C

### The Majority's Conclusions

The majority rejects the habeas court's determination that Sherman's failure to implicate Thomas Skakel in the victim's murder was objectively unreasonable, but not for any of the reasons that Sherman gave at the petitioner's habeas trial. Rather, because, in the majority's view, the evidence did not support the habeas court's finding that Thomas Skakel discussed "the details" of his sexual encounter with the victim when he met with Sherman and Throne in 2002, the habeas court incorrectly concluded that Sherman could have put Throne on the stand to testify about Thomas Skakel's admissions. The majority also concludes that the habeas court's finding that Throne could have testified about the admissions was "entirely speculative" in light of Throne's inability, at the petitioner's 2013 habeas trial, to remember the specifics of what was discussed at the 2002 meeting, apart from the fact that Thomas Skakel admitted to having lied to the police about when he had last seen the victim. The majority is mistaken on both counts.

First, it is abundantly clear that Thomas Skakel *did* discuss the details of his sexual encounter with the victim. After the petitioner's habeas counsel read aloud from the portion of the Sutton Report describing when, where and how the sexual encounter unfolded, Sherman stated that Thomas Skakel "basically repeated . . . the version of events as you recited or read [from] the Sutton Report . . . ." Sherman later confirmed that "his . . . discussion with [him] was consistent with what was in the Sutton Report." Sherman also testified that Thomas Skakel "recounted" his sexual encounter with the victim at the meeting. At another point, Sherman testified that it was not his impression from talking to Thomas Skakel that the encounter involved sexual intercourse, only "sexual play," something of the nature of "touching, masturbation, mutual masturbation, that kind of stuff." Sherman further testified that the encounter occurred "ten minutes before . . . 10 p.m."

The majority does not explain what additional details about the sexual encounter were required for Sherman to assert a strong third-party culpability claim against Thomas Skakel. The fact is that Sherman had all of the information he needed. Indeed, it was not the precise nature of Thomas Skakel's purported sexual encounter with the victim that mattered. It was the fact that he had one at *all* that mattered because it allowed Sherman to argue to the jury that Thomas Skakel had lied to the police when he told them that there had been no such encounter and that the victim had left his house at 9:30 p.m. In any event, it is readily apparent that the habeas court's finding that Thomas Skakel discussed his sexual encounter with the victim when he met with Sherman

and Throne in 2002 is supported by the habeas trial record. It is the majority's finding to the contrary that is belied by the record.

The majority also concludes that "[a]ny finding concerning the details that Throne could have relayed to the jury about Thomas Skakel's alleged encounter with the victim would . . . be entirely speculative" in light of Throne's inability to recall, in 2013, what was discussed at the 2002 meeting, beyond the fact that Thomas Skakel's admission had made a significant impression on him because Thomas Skakel acknowledged that he was with the victim much longer than what he had told the police. The majority must do better than this. It simply cannot be the position of this court—or any court—that it is entirely speculative to conclude that defense counsel would remember bombshell revelations favorable to his or her client long enough to be able to testify about them at the client's murder trial a few days later, if called on to do so. If competent counsel has a duty under *Strickland* that "includes the obligation to investigate all witnesses who may have information concerning [the defendant's] guilt or innocence"; *Towns* v. *Smith*, supra, 395 F.3d 258; it is axiomatic that he also has a duty *to remember* what those witnesses tell him—at least long enough to act on the information for the benefit of his client. This applies in spades to a witness as important to the defense as Thomas Skakel, for years the prime suspect in the victim's murder, and who, in accordance with their own timeline of the crime, Sherman and Throne had every reason to believe was with the victim at the time of her death.

Accordingly, Throne's inability to recall in 2013 the specifics of what was discussed at the 2002 meeting is simply irrelevant. The only issue that matters is whether he would have remembered what was discussed immediately following the meeting. That is when the petitioner claims that Sherman's representation was ineffective insofar as he failed to call Throne as a witness to repeat Thomas Skakel's admissions. The habeas court was absolutely correct that, under *Strickland* and its progeny, there is only one answer to that question and that is, of course, that he would have remembered.

The majority finally contends that, even if Throne could have testified as to Thomas Skakel's admissions, Sherman reasonably could have decided to forgo implicating Thomas Skakel in the victim's murder because there was no evidence that his sexual encounter with the victim turned violent, or because implicating Thomas Skakel ran the risk of strengthening the state's theory that the petitioner murdered the victim in a jealous rage. The majority thus suggests that "defense counsel in Sherman's position reasonably could have concluded that it was better to pursue a suspect [Littleton] who had at least arguably implicated himself in the crime." Again, neither of these contentions holds water.

First, Littleton inarguably did *not* implicate himself in the victim's murder, a fact that, as Benedict argued at the petitioner's criminal trial, would not have been lost on a child much less on a jury of twelve adults. Indeed, even Sherman could not make a straight-faced argument tying Littleton to the murder.

Moreover, the facts simply do not support the majority's low estimation of the strength of the evidence implicating Thomas Skakel. Indeed, one is hard-pressed to find a Connecticut case—or a case from any other jurisdiction—in which the evidence of third-party culpability was any stronger. The majority certainly has not cited one. Not even Sherman claimed that asserting a third-party claim against Thomas Skakel was not in the petitioner's best interest. While Sherman had plenty of evidence against Thomas Skakel, he mistakenly believed that, without Thomas Skakel's testimony, he did not have enough admissible evidence to satisfy the threshold for raising such a claim.

Second, it is simply absurd for the majority to suggest that Sherman reasonably could have decided against asserting a powerful and compelling third-party culpability defense against Thomas Skakel out of concern that it would bolster the state's tenuous theory that the then fifteen year old petitioner murdered the victim in a jealous rage. As the respondent acknowledges, the evidence adduced at trial to support that theory was scant at best. Indeed, the respondent can identify only two pieces of evidence that supported it. The respondent first points to a telephone conversation between Geranne Ridge and a friend, which the friend secretly recorded for Garr, during which Ridge claimed to have met the petitioner at a party, and that the petitioner told her within minutes of their meeting about "masturbating in a tree" and murdering the victim because she had had sex with Thomas Skakel. At the petitioner's criminal trial, however, Ridge testified that, although it was true that she had once been introduced to the petitioner at a party, she did not actually speak to him, and everything that she had told her friend on the telephone was gleaned from "magazines, newspapers and from [the tabloids]," like the "Star, Globe, Inquirer, those kinds of things." An embarrassed Ridge testified that she had lied to her friend because he "was always bragging about who he knew" and Ridge just wanted to seem "more knowledgeable than [she] was" about the petitioner's case.

The only other evidence that the respondent cites in support of the theory regarding the petitioner's motive is the trial testimony of Elizabeth Arnold, who stated that, in 1978, while she and the petitioner were enrolled at Elan School,[27] the petitioner told her "that his brother [fucked] his girlfriend . . . well, they didn't really have sex but they were fooling around." On cross-examination, Arnold was asked why, when testifying before the

grand jury, she had failed to mention that the petitioner had told her that Thomas Skakel had fooled around with his girlfriend. Arnold responded that she did not remember it at the time but that reading Fuhrman's book afterward had refreshed her recollection.

Fuhrman's book, an entirely speculative account of how the murder *could* have unfolded, appears to have refreshed the recollections of many witnesses for the prosecution, several of whom came forward only after reading it, or after reading or watching a news story about it. One key witness, Shakespeare, completely altered her account of the night of the murder after reading it.[28] The central thesis of the book, borrowed from one of several theories posited in the stolen Sutton files, was that the petitioner and the victim were boyfriend and girlfriend and that the petitioner flew into a rage upon seeing the victim in a sexual encounter with Thomas Skakel. See M. Furhman, Murder In Greenwich (1998) p. 215. Indeed, in the book, Fuhrman claimed that unnamed sources had told him that the petitioner and the victim were once boyfriend and girlfriend. Id. Fuhrman also claimed that the victim's diary "clearly stated that both Skakel boys were romantically interested in her. [The victim] also said that while she liked Thomas [Skakel], she had to be careful of [the petitioner]." Id. The victim's diary, of course, says nothing of the sort. Nor does it appear that Sherman read it; if he had, he would have used it to rebut the state's dubious claim as to the petitioner's motive.[29]

Indeed, in her diary, the victim wrote candidly about her boyfriends and social exploits during the fifteen months that she lived in Greenwich. She was an avid chronicler of her adolescent life and enjoyed writing about boys—the ones she liked, the ones she did not like, the ones she suspected liked her, and so on and so forth. If the victim and the petitioner were in a relationship during the eight weeks that they knew one another, or if the victim suspected that the petitioner liked her during that time period, it is safe to say that it was the *only* time that the victim did not write about such matters in her diary. It is clear, therefore, that the state's theory as to motive could have been easily rebutted by a minimally competent defense attorney using the resources available to him, and that it presented no obstacle whatsoever to Sherman's ability to present a compelling third-party culpability defense implicating Thomas Skakel. The habeas court was absolutely right to conclude that, by failing to assert such a defense, Sherman simply was not acting as the competent counsel guaranteed by the sixth amendment.

### III

### PREJUDICE

There can be little doubt that the petitioner was severely prejudiced by Sherman's deficient perfor-

mance in his presentation of the petitioner's alibi and third-party culpability defenses. To satisfy the prejudice prong of *Strickland,* "[the petitioner] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Janulawicz* v. *Commissioner of Correction,* 310 Conn. 265, 268 n.1, 77 A.3d 113 (2013). In this context, a reasonable probability that the result of the trial would have been different "does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . Rather, it merely requires the petitioner to establish a probability sufficient to undermine confidence in the outcome." (Citation omitted; internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 445–46, 610 A.2d 598 (1992). Moreover, "[i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction,* supra, 306 Conn. 688–89.

In the present case, as the habeas court observed, "[i]t would be an understatement to say that the state did not possess overwhelming evidence of the petitioner's guilt. An unsolved crime for more than two decades, there was evidence that initially the Greenwich police sought the arrest of [Thomas] Skakel without success and then focused on Littleton to no avail before finally turning to the petitioner. The evidence adduced at trial was entirely circumstantial, consisting . . . [primarily] of testimony from witnesses of assailable credibility who asserted that, at one time or another and in one form or another, the petitioner made inculpatory statements. The state also adduced, as consciousness of guilt evidence, testimony that the petitioner changed his initial account to the police of his movements on the evening of the murder."

Not only was there no physical evidence connecting the petitioner to the crime and no eyewitnesses, few of the witnesses who did testify were interviewed by the police at the time of the events in question. Almost all of the state's witnesses, in fact, testified based on their recollections of those events some twenty-five years after the fact. While this would be a concern in any murder case, it was especially problematic in the present one given the extensive pretrial publicity surrounding the case. The risk inherent in prosecuting a murder case on the basis of twenty-five year old memories filtered through such a potentially corruptive lens

is obvious. Memories rarely improve over time, even under the best of conditions. The state's evidence, which, as the habeas court noted, consisted largely of the testimony of witnesses of suspect credibility who did not come forward until decades after the events in question, was hardly so convincing as to render harmless the kinds of grievous errors committed by Sherman in his conduct of the petitioner's criminal trial.

In the intervening years since the petitioner's conviction, unsettling questions have also arisen over the veracity of core tenets of the state's central thesis relative to the petitioner's guilt, weakening what was to begin with a less than persuasive case. As the habeas court explained in connection with the petitioner's claim that Sherman's representation was ineffective insofar as he failed to challenge one such fundamental aspect of the state's case against him, information contained in the state's own investigative file and available to Sherman before trial revealed that the state's argument was baseless, and, yet, it went unchallenged by the defense.[30]

No argument, however, was more central to the state's theory of guilt or damaging to the petitioner than that of the alleged conspiracy by the petitioner's family to fabricate an alibi for him. Thus, the prejudicial impact of Sherman's failure to locate and interview Ossorio, a critical independent alibi witness with no ties to the petitioner's family, is virtually incalculable because it deprived the petitioner of the opportunity to disprove the state's central thesis. Cf. *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 689 ("[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture" [internal quotation marks omitted]). Moreover, in presenting a far weaker alibi defense than would have been put forward by competent counsel—one that left the door wide open for the state to argue that the alibi was predicated solely on the testimony of close family members, all of whom were lying to protect the petitioner—Sherman's performance harmed the petitioner in yet another way, "for it is generally acknowledged that an attempt to create a false alibi constitutes evidence of the defendant's consciousness of guilt." (Internal quotation marks omitted.) *Henry* v. *Poole*, 409 F.3d 48, 65 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622, 164 L. Ed. 2d 334 (2006); see also id. ("[T]here is nothing as dangerous as a poorly investigated alibi. An attorney who is not thoroughly prepared does a disservice to his client and runs the risk of having his client convicted even [when] the prosecution's case is weak." [Internal quotation marks omitted.]).

Sherman's deficient performance resulting from his failure to present a powerful third-party culpability defense predicated on evidence that the victim was killed by the petitioner's brother, Thomas Skakel, a

longtime suspect in the victim's murder, also caused the petitioner serious prejudice: it deprived him of the opportunity to provide the jury with convincing evidence that someone other than the petitioner had the motive, means and opportunity to kill the victim. This is particularly true in light of the fact that Sherman had startling new and highly incriminating evidence linking Thomas Skakel to the crime, namely, Thomas Skakel's own statement acknowledging both that he had lied to investigators about the time that he and the victim departed on the evening of October 30, 1975, and that he had had a sexual encounter with the victim at the scene of the murder when it most likely was committed. Such a compelling third-party culpability defense focusing on Thomas Skakel—in contrast to the foolhardy attempt to implicate Littleton—no doubt would have raised a reasonable doubt in the jurors' minds as to who murdered the victim. Although the prejudice flowing from Sherman's incompetent handling of the petitioner's third-party culpability defense is alone more than sufficient to require a new trial, when that prejudice is considered along with the prejudice flowing from Sherman's deficient handling of the alibi defense, it strains credulity to believe that the petitioner's trial resulted in a verdict worthy of confidence.

## IV

## CONCLUSION

Under our constitution and system of laws, a defendant is presumed innocent until he has been found guilty beyond a reasonable doubt after a fair trial. A critical component of a defendant's right to a fair trial is the right to the effective assistance of counsel. As the habeas court aptly observed, counsel's "defense of a serious felony prosecution requires attention to detail, an energetic investigation and a coherent plan of defense capably executed." When counsel has not performed competently in one or more of these respects—in the present case, defense counsel was deficient in all three areas—and when, as in the present case, a review of the record also leads to the conclusion that, because of counsel's deficient performance, confidence in the guilty verdict has been undermined, the conviction is not sufficiently reliable and cannot be permitted to stand. Nothing short of a new trial will suffice to vindicate the defendant's right to a proceeding that leads to a reliable outcome.

In recognition of these core principles, more than fifty years ago, the United States Supreme Court stated that, "if the right to counsel guaranteed by the [c]onstitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and . . . judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts." *McMann* v. *Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763

(1970). Today, this court shirks its responsibility to maintain such standards by upholding a guilty verdict reached only after a trial literally riddled with highly prejudicial attorney incompetence. One can only trust that the petitioner will receive a fairer hearing, one in which his right to the effective assistance of counsel is accorded due consideration, in the federal courts.

[1] This right is made applicable to state prosecutions through the due process clause of the fourteenth amendment. E.g., *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 554, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*, U.S. , 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016).

[2] With respect to the other seven areas in which Sherman was found to have represented the petitioner incompetently, the habeas court was unable to conclude that the prejudice flowing from that inadequate representation was so great as to warrant a new trial. In his cross appeal, the petitioner contends that the habeas court incorrectly concluded that he was not sufficiently harmed by those seven areas of deficient performance to warrant a new trial. In view of my conclusion that the petitioner is otherwise entitled to a new trial, I need not address the claims that the petitioner raises in his cross appeal.

[3] The majority expresses its displeasure with my characterization of its analysis of the alibi issue as transparently one-sided and unfair, and also accuses me more generally of misstating its views. See footnote 1 of the majority opinion. With respect to the former, there is no euphemistic way to describe the majority's analysis: it completely ignores the countervailing considerations that the habeas court found to be decisive and provides no reason or justification for doing so. With respect to the latter, the majority does not identify any of the views that it claims I have misstated, and I know of none.

[4] Testimony established that the Terrien home is about a twenty minute car ride from the Skakel home.

[5] For example, at one point, Littleton was a suspect, but he ultimately was cleared of any possible involvement in the murder. Indeed, prior to the petitioner's criminal trial, Littleton was given immunity from prosecution by the Office of the State's Attorney, presumably so that he would be willing to testify at the petitioner's criminal trial to rebut the petitioner's contention that he, Littleton, might have killed the victim. See part II of this opinion.

[6] The petitioner's father, Rushton Skakel, Sr., who is now deceased, hired Sutton Associates to investigate the victim's murder in the apparent hope of exonerating his family members. According to Leonard Levitt, a journalist who has written extensively about the case, Rushton Skakel, Sr., gave those investigators free rein to pursue the investigation wherever it led them, purportedly assuring them that, if it turned out that a member of his family was responsible for the victim's murder, the family would publicly acknowledge it. In 1994, an employee of Sutton Associates stole the firm's files on the case, including detailed suspect profiles of Thomas Skakel and the petitioner, and gave them to Levitt and Dominick Dunne, an author, who, in turn, gave them to Mark Fuhrman, the former detective famous for perjurious testimony in the Orenthal James (O.J.) Simpson murder trial. In 1998, Fuhrman published a book in which he purported to solve the long unsolved murder of the victim by accusing the petitioner based on one of several theories of the murder posited by Sutton Associates investigators and contained in the stolen files, namely, that the petitioner may have had a relationship with the victim and become jealous upon seeing her and Thomas Skakel "carrying on" in the Skakel driveway.

[7] Although Benedict observed in closing argument, more or less in passing, that the jury was not required to reject the petitioner's alibi defense in order to find him guilty—because the forensic evidence indicated that she conceivably could have been alive as late as 5:30 a.m. on October 31, 1975—he made no effort to explain where the victim conceivably could have been after 9:30 p.m. on October 30, when she was due home. Indeed, not one of the hundreds of persons interviewed by the police since the crime was committed ever saw the victim after 9:30 p.m., when she was last seen with Thomas Skakel. Neither did Benedict proffer a credible explanation as to why several people, including the victim's mother, heard dogs barking agitatedly and other unusual noises between 9:30 and 10 p.m. on October 30. Moreover, although Benedict asserted that the victim could have been alive after 10 p.m., Benedict himself acknowledged that there is no reasonable likelihood that the victim was alive after 1 a.m. on October 31. In any event,

if the petitioner could have demonstrated to the satisfaction of the jury that he was not anywhere near the scene of the crime between 9:30 and 10 p.m. on October 30—indeed, if he could have raised a reasonable doubt in the jurors' minds as to his whereabouts at that time—it is highly unlikely that he would have been found guilty of the victim's murder.

[8] See also *Heard* v. *Addison*, 728 F.3d 1170, 1180 (10th Cir. 2013) ("[a] decision not to investigate cannot be deemed reasonable if it is uninformed" [internal quotation marks omitted]); *Mosley* v. *Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("[i]f [defense counsel] . . . never found out what [the] testimony [of the potential witnesses] would be, he could not possibly have made a reasonable professional judgment that their testimony would have been [unnecessary] and could not have chosen not to call [the witnesses] as a matter of strategy"); *Bond* v. *Beard*, 539 F.3d 256, 289 (3d Cir. 2008) ("It is difficult to call [defense counsel's] decisions 'strategic' when they failed to seek rudimentary background information about [the potential witness]. Strategy is the result of planning informed by investigation, not guesswork. The record does not support the suggestion that [defense counsel's] investigation met prevailing professional standards."), cert. denied, 558 U.S. 835, 130 S. Ct. 81, 175 L. Ed. 2d 56 (2009), and cert. denied, 558 U.S. 932, 130 S. Ct. 58, 175 L. Ed. 2d 232 (2009); *Anderson* v. *Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) ("[counsel cannot rely] exclusively on . . . assumptions divined from a review of the [s]tate's files," and "[w]ithout so much as contacting a witness, much less speaking with him, counsel is ill-equipped to assess his credibility or persuasiveness as a witness" [internal quotation marks omitted]); *Lord* v. *Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) (counsel improperly relied on his "vague impression" that police investigators who interviewed three potential key defense witnesses did not find them credible because "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether . . . to proffer a witness at trial," and "counsel cannot make [that judgment] about a witness without looking him in the eye and hearing him tell his story"), cert. denied sub nom. *Lambert* v. *Lord*, 528 U.S. 1198, 120 S. Ct. 1262, 146 L. Ed. 2d 118 (2000); *Kenley* v. *Armontrout*, 937 F.2d 1298, 1308 (8th Cir.) ("'[c]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made' " but, instead, bases that decision on unsupported assumptions), cert. denied sub nom. *Delo* v. *Kenley*, 502 U.S. 964, 112 S. Ct. 431, 116 L. Ed. 2d 450 (1991).

[9] With respect to the factual premise of the respondent's argument, I disagree with the majority's assertion that the habeas court credited Sherman's testimony that the petitioner had not told him about Ossorio's presence at the Terrien residence on the evening of October 30, 1975, and discredited the petitioner's contrary testimony that he had, in fact, brought that fact to Sherman's attention. The habeas court made no such finding, explaining, instead, that it made no difference whether the petitioner had informed Sherman about Ossorio because Sherman was on notice, by virtue of Dowdle's grand jury testimony, that her "beau" was, in fact, at the Terrien residence. In essence, the habeas court simply assumed that the petitioner had not told Sherman about Ossorio and then proceeded to explain why Dowdle's grand jury testimony was more than sufficient to place Sherman on notice of Ossorio as a potential independent alibi witness. I fully agree with the habeas court that, in light of Dowdle's grand jury testimony, it matters not whether the petitioner told Sherman about Ossorio. If, however, it truly matters to the majority, I would urge the majority to obtain an articulation from the habeas court on this issue because I firmly believe that the majority is mistaken in its reading of the habeas court's decision. Because, however, the majority proceeds on the premise that the petitioner did not apprise Sherman about Ossorio, and because it makes no difference for purposes of my analysis, I assume that such was the case.

[10] The majority makes much of the fact that, according to Sherman's testimony at the habeas trial, none of the petitioner's alibi witnesses ever told him that Ossorio or anyone else was present at the Terrien home on the evening of October 30, 1975. The majority's reliance on this testimony is misplaced. First, the habeas court never made any findings with respect to the credibility of that testimony, and so the majority has no basis to treat it as accurate. Second, the issue is not whether the witnesses volunteered information about Ossorio to Sherman because, as I have explained, there are many reasons why they would not have known that Ossorio was a potentially important witness. Indeed, the fact that Dowdle was unaware of Ossorio's importance is reflected in her matter-of-fact grand jury and

trial testimony about Ossorio. Third, Sherman was questioned at the habeas trial whether *he had asked* the family alibi witnesses about the presence of anyone else at the Terrien residence on the evening of October 30. With respect to Rushton Skakel, Jr., and John Skakel, Sherman could say only, "[p]robably." When asked the same question about Terrien and Dowdle, Sherman answered, "I would assume I did." In fact, Sherman's "assum[p-tion]" that he had questioned Dowdle on the issue was patently incorrect: the habeas court expressly found that, *if* Sherman *had asked* Dowdle about her "beau," she would have identified him as Ossorio. Sherman, however, never did inquire about Dowdle's beau.

[11] The majority tries to distinguish *Rompilla* from the present case on the ground that *Rompilla* did not involve an alibi defense. The majority's argument presents a classic example of a distinction without a difference. The fact that *Rompilla* is not an alibi case is completely irrelevant, and the majority provides no explanation for its contrary assertion. *Rompilla* is highly relevant to the present case because it underscores the fact that counsel has an obligation to make reasonable inquiry into facts in mitigation or other red flags when reviewing discovery materials, even when those facts or red flags are unexpected. Dowdle's testimony concerning her "beau" is precisely the kind of red flag that competent counsel would have recognized and pursued further.

[12] Ease of access, rather than whether the petitioner supplied the name of the witness, was the focus of the court's analysis in *Gaines*. Given our previous recognition that counsel may be required to investigate leads not supplied by a client; see *Siemon* v. *Stoughton*, 184 Conn. 547, 557, 440 A.2d 210 (1981) (counsel was ineffective for failing to interview witnesses of related incidents presented by investigator); whether a name was supplied is simply irrelevant. In both *Gaines* and the present case, counsel made a conscious decision not to investigate an identifiable witness whose testimony might well have been helpful.

[13] To do otherwise when reviewing testimony pertaining directly to the petitioner's alibi in a case relying largely on an alibi defense would itself clearly amount to ineffective assistance of counsel, and the majority does not contend otherwise. On the contrary, the majority sets forth the reasons why, in its view, Sherman's conscious decision not to pursue the Ossorio lead was reasonable.

[14] I again underscore the minimal effort that would have been required of Sherman to locate Ossorio, as well as the potentially great reward of a disinterested alibi witness. See, e.g., *Montgomery* v. *Petersen*, supra, 846 F.2d 413 (counsel was ineffective by failing to track down "extraordinarily significant" testimony of single disinterested alibi witness in case). By way of analogy, we are not asking Sherman to waste his time panning for gold on a miner's chance of striking it rich. We are simply asking him to check the number on his bingo card to see if it matches the winning draw. Whereas the former might reasonably be characterized as a fool's errand, the failure to do the latter is neither rational nor reasonable.

[15] Moreover, as the Third Circuit has explained, incomplete knowledge of a witness' name does not render the witness unidentifiable. See *Gregg* v. *Rockview*, supra, 596 Fed. Appx. 77 (counsel acted unreasonably in failing to ascertain identity of alibi witness merely referenced by petitioner as "Weezy").

[16] *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004), which the majority also cites for the proposition that counsel's representation is not deficient when he fails to investigate witnesses not mentioned by the client, is similarly inapposite. In that case, although the habeas court *was* presented with the testimony of the missing witness, there was nothing to indicate that the witness was identifiable by counsel at the time of trial. Instead, the habeas court suggested that counsel *might have discovered* the witness with a properly attuned line of questioning, a suggestion that the Appellate Court reasonably rejected. See id., 816–17. Such a fact pattern is entirely distinct from one involving the failure to investigate a readily *identifiable* witness, as in the present case.

[17] As the majority explains, to put forth a third-party culpability defense, the defendant "must . . . present evidence that directly connects a third party to the crime with which the defendant has been charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted;

internal quotation marks omitted.) *State* v. *Hernandez*, 224 Conn. 196, 202, 618 A.2d 494 (1992). Third-party culpability evidence is admissible, therefore, when the evidence is sufficient to give rise to a reasonable doubt about the defendant's guilt. See, e.g., *State* v. *Baltas*, 311 Conn. 786, 810–11, 91 A.3d 384 (2014).

[18] The majority intimates that Sherman was unaware of the futility of a third-party culpability defense predicated on Littleton's commission of the murder, observing that the habeas court made no finding that Sherman was aware before the petitioner's criminal trial that the core of his third-party culpability defense against Littleton—Littleton's purported admissions—was the result of a ruse that had been played on him by state and local investigators. No such finding was required, however, because the record establishes that Sherman was made aware of this fact by the state's pretrial motion to preclude him from raising a third-party culpability defense against Littleton on the ground that there was no evidence connecting Littleton to the murder.

[19] In light of the complete absence of evidence suggesting that Littleton had played a role in the victim's murder, it is difficult to understand why the trial court permitted Sherman to raise a third-party culpability defense predicated on Littleton's commission of the murder. Perhaps it is because before the Littleton evidence actually was presented in open court to the jury, it appeared to the court that Littleton might have made some potentially incriminating statements to Baker or Morall. As the real story emerged, however, it became crystal clear that Littleton never did any such thing. By that point, of course, Sherman was stuck with his ill-advised decision to present the Littleton third-party culpability defense.

[20] Sherman also sought to implicate Littleton on the basis of certain additional facts, but none of these facts would have created the slightest doubt in the minds of the jurors as to the wisdom of the state's decision to grant Littleton immunity from prosecution. Indeed, none of them even connected Littleton to the murder. For example, the majority states that Sherman presented the testimony of state criminalist, Henry Lee, that "two hairs found at the crime scene were microscopically similar to head hairs from Littleton." Contrary to the majority's assertion, however, the hairs in question were not found at the crime scene but, rather, on sheets that were brought to the crime scene, by responding officers, who used them to cover the victim's body for transport to the morgue. As a result, it could not be determined whether the hairs were present during the commission of the crime or whether they were brought to the crime scene with the sheets. Sherman was also aware before the petitioner's criminal trial that mitochondrial DNA testing of one of the hairs had conclusively eliminated Littleton as the source of that hair. Although insufficient DNA material was obtained from the second hair to permit similar testing, all of the trial experts agreed that the hair showed both similarities and dissimilarities to Littleton's hair such that the most that could be gleaned from a comparison of the two was that Littleton could not be excluded from the class of potential donors.

Sherman also introduced evidence of Littleton's erratic behavior in the years following the murder, the apparent result of alcoholism and an untreated bipolar disorder. But he utterly failed to present an intelligible connection between that behavior, which occurred many years after the murder, and any possible involvement by Littleton in the murder. In one incident, for example, which took place in the 1990s, Littleton was arrested for drunk and disorderly conduct after climbing a tower in Florida and delivering President John F. Kennedy's "Iich bin ein Berliner" speech. During his arrest, Littleton identified himself as "Kenny Kennedy, the black sheep of the Kennedy family." On the basis of this evidence, Sherman argued that Littleton once identified himself as "Kenny Kennedy because [John F. Kennedy] was his hero. He painted himself as the black sheep of the Kennedy family. How does that figure in here? I don't know." It is unlikely the jury knew either. The majority also notes that Sherman, in the petitioner's pretrial motion for permission to present a third-party culpability defense, indicated that he "planned to show that Littleton had lied to the police in his initial statement about his activities on the night [of the victim's murder] . . . and later had changed his account about his activities that night on several occasions." Sherman appeared to abandon this argument at the petitioner's criminal trial, however, as there is no mention of it in his closing argument; nor does there appear to be any evidence to support it.

[21] The Skakel family chauffeur, Franz Wittine, reported to the police that, "on several occasions he observed Thomas [Skakel] leave his house to take a walk, carrying a golf club. He also reported that he had observed Thomas

[Skakel] in outbreaks of rage." Another witness, "Jackie Wetenhall, one of [the victim's] close friends . . . observed Thomas [Skakel] . . . walking . . . at night, carrying a golf club."

[22] Joseph Jachimczyk, a physician and then Chief Medical Examiner for Harris County, Texas, assisted the Greenwich police in their investigation and determined that the time of the victim's death was 10 p.m., which determination was based, in part, on the contents of her stomach and the extent of rigor mortis that had set in by the time her body was discovered. Harold Wayne Carver II, the state Chief Medical Examiner in 2002, testified that, although the victim could have died as late as 5:30 a.m. on October 31, 1975, in his opinion, she died "closer to 9:30 p.m." on October 30.

[23] The record establishes that, at approximately 9:45 p.m., a dog belonging to the Ix family became extremely agitated at the foot of the family's driveway, directly across the street from the entrance to the victim's driveway. It was later determined, on the basis of blood spatter found at the scene, that the victim was initially assaulted at that location. Ix reported to the police that, when she returned from the Skakel driveway at 9:30 p.m., she immediately telephoned a friend. Ix reported that, while she was talking on the telephone, at approximately 9:45 p.m., her dog began to bark incessantly and "violently" in the direction of the victim's driveway. Ix went outside to call the dog, but the dog refused to come even though it always came when she called him. Ix testified that the dog "was kind of frozen in the road like he didn't [want to] go any closer," and that she had never seen him so "scared" or agitated. After about twenty or twenty-five minutes of constant barking, the family's housekeeper had to go out and force the dog inside. Another of the victim's neighbors, Robert Bjork, reported that, although he did not appreciate the significance of his dog's behavior at the time, he observed his dog, at approximately 10 p.m., run back and forth between where the victim's blood was found on the driveway and the tree where the victim's body was discovered.

[24] One might think that Thomas Skakel's admissions, or statements against penal interest, would have been admissible through a witness from Sutton Associates. Issues relating to the attorney-client and work product privileges, however, ultimately prevented any such use of the Sutton Report or its authors.

[25] Throne testified that he was "fresh out of law school," with no prior experience in the area of criminal law, when Sherman hired him to work on the petitioner's case. Sherman's son, Mark Sherman, was second chair.

[26] I also note that Sherman did not request a jury instruction on the petitioner's third-party culpability defense, and the trial court did not give one. Nor did Sherman undertake to explain the legal significance of the defense in closing argument. As this court determined in *State* v. *Arroyo*, 284 Conn. 597, 609, 935 A.2d 975 (2007), a defendant is entitled to an instruction on a third-party culpability defense if requested. Perhaps because *Arroyo* was decided after the petitioner's criminal trial, the petitioner has not claimed that Sherman's representation was ineffective insofar as he failed to request such an instruction. However, whether the jury fully understood that the state bore the burden of rebutting the defense beyond a reasonable doubt—and that it was not the petitioner's burden to establish Littleton's guilt—is not clear. In any event, the fact that the Littleton third-party culpability defense had no basis in fact doomed it from the very start; under the circumstances, Sherman's failure to apprise the jury of its legal import was inconsequential.

[27] The petitioner was sent to Elan School, an alcohol and drug rehabilitation facility for troubled adolescents in Poland, Maine, in 1978, as part of a plea agreement after the petitioner was charged with driving under the influence in New York.

[28] The majority also relies on Fuhrman's book to support its conclusion that Sherman reasonably could have decided to forgo implicating Thomas Skakel out of fear that it might bolster the state's theory as to the petitioner's motive. See footnote 18 of the majority opinion. Such reliance only reflects the thin reed on which the majority's argument rests.

[29] It is unfortunate that the majority has seen fit to rely on Fuhrman's speculative account of a relationship between the victim and the petitioner as a basis for reversing the habeas court's judgment. Although the possibility of such a relationship was one of several theories posited by the Sutton investigators in the mid-1990s, no credible evidence was adduced at the petitioner's 2002 criminal trial in furtherance of it.

[30] The aspect of the case identified by the habeas court pertains to State's Attorney Benedict's argument at trial that the petitioner was sent to Elan

School as part of the Skakel family's broader cover-up to hide him from the police, who were kept in the dark regarding his whereabouts. This contention is belied by police investigative reports, which make clear that the police knew full well that the petitioner was at Elan School and had been in direct contact with the school. This point is important because Benedict also argued at trial that administrators at Elan School, who repeatedly accused the petitioner of having murdered the victim, learned of the petitioner's involvement in the murder from the petitioner's own family, and not from the police.

---